**2024-2042**

# United States Court of Appeals for the Federal Circuit

MICHAEL E. KELLY, FBOP CORP., RIVER CAPITAL ADVISORS, INC., PARK NATIONAL BANK, SAN DIEGO NATIONAL BANK, PACIFIC NATIONAL BANK, BANKUSA, NORTH HOUSTON BANK, MADISON STATE BANK, COMMUNITY BANK OF LEMONT, CITIZENS NATIONAL BANK, CALIFORNIA NATIONAL BANK,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

*On Appeal from the United States Court of Federal Claims in No. 1:21-cv-01949-MRS, Honorable Molly R. Silfen, Judge*

## BRIEF FOR PLAINTIFFS-APPELLANTS

DANA M. HOWARD
LARSON LLP
555 South Flower Street, 30th Floor
Los Angeles, California 90071
(213) 436-4888
dhoward@larsonllp.com

ROBERT F. RUYAK
LARSON LLP
900 17th Street, NW, Suite 320
Washington, DC 20006
(202) 795-4900
rruyak@larsonllp.com

*Counsel for Plaintiffs-Appellants*

DECEMBER 9, 2024

COUNSEL PRESS (800) 4-APPEAL • (331247)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-2042

**Short Case Caption** Kelly v. U.S.

**Filing Party/Entity** Appellants Michael E. Kelly; [see Attachment 1 for add'l parties]

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/09/2024

Signature: /s/ Robert F. Ruyak

Name: Robert F. Ruyak

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| 1. FBOP Corporation | | N/A |
| 2. River Capital Advisors, Inc. | | FBOP Corporation |
| 3. Park National Bank | | FBOP Corporation |
| 4. San Diego National Bank | | FBOP Corporation |
| 5. Pacific National Bank | | FBOP Corporation |
| 6. BankUSA | | FBOP Corporation |
| 7. North Houston Bank | | FBOP Corporation |
| 8. Madison State Bank | | FBOP Corporation |
| 9. Community Bank of Lemont | | FBOP Corporation |
| 10. Citizens National Bank | | FBOP Corporation |
| 11. California National Bank | | FBOP Corporation |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Larson LLP | Diamond McCarthy LLP | Robert F. Ruyak |
| Allan Diamond | Dana M. Howard | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# ATTACHMENT 1 TO FORM 9 – CERTIFICATE OF INTEREST

**Filing Party/Entity:**

FBOP Corporation; River Capital Advisors, Inc.; Park National Bank; San Diego National Bank; Pacific National Bank; BankUSA; North Houston Bank; Madison State Bank; Community Bank of Lemont; Citizens National Bank; California National Bank

# ATTACHMENT 2 TO FORM 9 – CERTIFICATE OF INTEREST

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Michael E. Kelly | | N/A |

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ..... VI

TABLE OF AUTHORITIES ..... VIII

STATEMENT OF RELATED CASES ..... XVI

I. INTRODUCTION ..... 1

II. JURISDICTIONAL STATEMENT ..... 4

III. STATEMENT OF THE ISSUES ..... 4

IV. STATEMENT OF THE CASE ..... 5

A. *Washington Federal* Class Action ..... 5

B. Amended Complaint ..... 6

1. Federal Regulations Mandating Tier 1 Capital Reserves ..... 6

2. Government's Program to Redefine Appellants' Tier 1 Capital 7

3. The 2008 Conservatorship ..... 9

4. The Government Nationalization Caused the Immediate Regulatory Failures of Appellant Banks and a Government Taking of All Assets ..... 10

C. The CFC Dismisses the Amended Complaint ..... 11

V. SUMMARY OF THE ARGUMENT ..... 12

VI. ARGUMENT ..... 15

A. Standard of Review ..... 15

B. The Court of Federal Claims Has Subject-Matter Jurisdiction ..... 16

1. Section 2501 Must Now Pass the Clear-Statement Test ..... 16

2. Section 2501 Fails the Clear Statement Test ..... 20

3. *CalPERS* Did Not Abrogate *Bright* ..... 32

4. *American Pipe* Tolling Applies in this Case ..... 34

C. Appellants Sufficiently Stated a Direct Taking Claim ..... 35

1. Total Bank Assets Constitute a Valid Compensable Property Interest Under the Fifth Amendment ..... 35

2. Appellants Sufficiently Alleged Government Action Constituting A Complete Taking of Total Bank Assets ........... 39

D. Appellants' Taking Claim is Not Precluded by *Washington Federal* Because They Were Absent Class Members and There Was No Class Certification ........... 41

E. Appellants' Claims Are Not Barred By Prior Precedent ........... 45

1. *Washington Federal* Involved A Different Property Interest ........... 45

2. Appellants Had Different Investment-Backed Expectations than the *Washington Federal* Class Representatives ........... 47

3. Appellants' Engagement in a Highly Regulated Industry Does Not Negate Constitutional Protection ........... 52

4. Appellants' Alleged Injury Is Distinct from the GSEs and Prudential Standing Doctrine Does Not Apply ........... 55

F. Appellants Sufficiently Stated Claims for Breach of Implied Covenant and Implied Regulatory Contract ........... 56

1. Appellants Plausibly Alleged That a Contract was Formed ........... 56

2. Appellants Plausibly Alleged that the Government was a Party to the Contract ........... 57

VII. CONCLUSION ........... 59

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akootchook v. United States*,
271 F.3d 1160 (9th Cir. 2001) ....................43

*AlexSam, Inc. v. Aetna, Inc.*,
119 F.4th 27 (Fed. Cir. 2024) ....................16

*Am. Pelagic Fishing Co. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) ....................36, 39

*Ambase Corp. v. United States*,
58 Fed.Cl. 32 (2003)....................14, 47, 53

*American Pipe & Construction Co. v. Utah*,
414 U.S. 538 (1974)....................*passim*

*Anaheim Gardens, L.P. v. United States*,
953 F.3d 1344 (Fed. Cir. 2020) ....................49

*Reed Elsevier, Inc. v. Muchnick*,
559 U.S. 154 (2010)....................17

*Arbaugh v. Y&H Corp*.
546 U.S. 500 (2006)....................17, 26

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012)....................36

*Armstrong v. United States*,
364 U.S. 40 (1960)....................35, 38, 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................12, 45

*Big Oak Farms, Inc. v United States*,
141 Fed. Cl. 482 (2019)....................34

*Boechler, P.C. v. Commissioner of Internal Revenue*,
596 U.S. 199 (2022)....................20

*Bowles v. Russell*,
551 U.S. 205 (2007)....................17, 19, 24

*Bright v. United States*,
603 F.3d 1273 (Fed. Cir. 2010) ....................*passim*

*Brown v. Legal Found. of Wash*.,
538 U.S. 216 (2003)....................37

*Cal. Hous. Sec., Inc. v. United States*,
959 F.2d 955 (Fed. Cir. 1992) ....................54

*Calif. Public Employees' Retirement Sys. v. ANZ Securities, Inc*.,
582 U.S. 497 (2017)....................*passim*

*Cary v. U.S.*,
552 F.3d 1373 (Fed. Cir. 2009) ....................16

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ....................*passim*

*Collins v. Village of Palatine, Ill.*,
875 F.3d 839 (7th Cir. 2017) ....................35, 50, 51

*Collins v. Yellen*,
594 U.S. 220 (2021)....................51, 54

*Cooper v. Fed. Reserve Bank*,
467 U.S. 867 (1984)....................43

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014)....................33

*Devlin v. Scardelletti*,
536 U.S. 1 (2002)....................41

*ECC International Constructors, LLC v. Secretary of Army*,
79 F.4th 1364 (Fed. Cir. 2023) ....................19

*Faber v. Ciox Health, LLC*,
944 F.3d 593 (6th Cir. 2019) ....................43

*Fairholme Funds, Inc. v. United States*,
26 F.4th 1274 (Fed. Cir. 2022) ....................................................6, 51, 57, 58

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*,
1:13-mc-01288-RCL, ECF 421 (D.D.C. Mar. 20, 2024) ................................1, 5

*Finn v. United States*,
123 U.S. 227 (1887)..................................................................................27, 28

*Fisher v. United States.*,
69 Fed. Cl. 193 (2006)..................................................................................42

*Fort Bend County, Texas v. Davis*,
587 U.S. 541 (2019)..................................................................................23, 24

*Geneva Rock Products, Inc. v. United States*,
100 Fed. Cl. 778 (2011)..................................................................................35

*Golden Pac. Bancorp. v. United States*,
15 F.3d 1066 (Fed. Cir. 1994) ..........................................................................53

*Good v. United States*,
189 F.3d 1355 (Fed. Cir. 1999) ........................................................................47

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991) ........................................................................16

*Gross v. United States*,
106 Fed. Cl. 369 (2012)..................................................................................42

*Haggart v. United States*,
104 Fed. Cl. 484 (2012)..................................................................................44

*Haggart v. United States*,
108 Fed. Cl. 70 (2012)....................................................................................44

*Hammer v. Neighborhood Housing Servs. of Chicago*,
583 U.S. 17, 138 S.Ct. 13, 199 L.Ed.2d 240 (2017) ..........................................21

*Hardy v. United States*,
965 F.3d 1338 (Fed. Cir. 2020) ........................................................................16

*Harrow v. Department of Defense*,
601 U.S. 480 (2024)........................................................................*passim*

*INS v. National Center for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)..........................................................................23

*Jacobs v. United States*,
290 U.S. 13 (1933)............................................................................39

*Jaynes v. United States*,
69 Fed. Cl. 450 (2006)........................................................................42

*John R. Sand & Gravel Co. v. United States*,
552 U.S. 130 (2008)........................................................................*passim*

*Jones v. United States*,
846 F.3d 1343 (Fed. Cir. 2017)...........................................................45

*Kendall v. United States*,
107 U.S. 123 (1883)..............................................................24, 25, 28, 30

*Leider v. United States.*,
301 F.3d 1290 (Fed. Cir. 2002)...........................................................36

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)..........................................................................54

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)........................................................................47

*McIntosh v. United States*,
601 U.S. 330 (2024)..........................................................................17

*Menominee Indian Tribe of Wis. v. United States*,
577 U.S. 250 (2016)..........................................................................32

*MOAC Mall Holdings LLC v. Transform Holdco LLC*,
598 U.S. 288 (2023)..............................................................16, 20, 27, 31

*Moden v. United States*,
404 F.3d 1335 (Fed. Cir. 2005)...........................................................36

*Mola Dev. Corp. v. United States*,
516 F.3d 1370 (Fed. Cir. 2008) ....................56

*Monongahela Nav. Co. v. United States*,
148 U.S. 312 (1893)....................36, 37

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) ....................48, 49

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022)....................21

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)....................44

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922)....................40

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) ....................48

*Paxton v. Union Nat'l Bank*,
688 F.2d 552 (8th Cir. 1982) ....................44

*Perry Capital LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017)....................44

*Phelps v. United States*,
274 U.S. 341 (1927)....................39

*Phillips v. Wash. Legal Found.*,
524 U.S. 156 (1998)....................37

*Postow v. OBA Fed. Sav. & Loan Ass'n*,
627 F.2d 1370 (D.C. Cir. 1980)....................43

*Preminger v. Sec'y of Veterans Affairs*,
517 F.3d 1299 (Fed. Cir. 2008) ....................45

*Pruitt v. Allied Chem. Corp.*,
85 F.R.D. 100 (E.D. Va. 1980)....................44

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)....47

*Santos-Zacaria v. Garland*,
598 U.S. 411 (2023)....17

*Schwarzschild v. Tse*,
69 F.3d 293 (9th Cir. 1995)....43

*Seaboard Air Line Ry. Co. v. United States*,
261 U.S. 299 (1923)....39

*Sebelius v. Auburn Regional Medical Center*,
568 U.S. 145 (2013)....23

*Simmons v. Small Bus. Admin.*,
475 F.3d 1372 (Fed. Cir. 2007)....45

*Smith v. Bayer Corp*.,
564 U.S. 299 (2011)....42

*Soriano v. United States*,
352 U.S. 270 (1957)....30, 31

*Steel Co v. Citizens for a Better Environment*,
523 U.S. 83 (1998)....21

*Taha v. United States*,
28 F.4th 233 (Fed. Cir. 2022)....15

*Taylor v. Sturgell*,
553 U.S. 880 (2008)....43

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004)....55

*Toscano v. United States*,
98 Fed. Cl. 152 (2011)....35

*Tyler v. Hennepin Cty.*,
598 U.S. 631 (2023)....36, 39

*Union Pacific R. Co. v. Locomotive Engineers*,
558 U.S. 67 (2009)........................................24

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945)........................................37, 38

*United States v. Lippitt*,
100 U.S. 663 (1880)........................................25, 26, 27, 28

*United States v. New York*,
160 U.S. 598 (1886)........................................27

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)........................................53

*United States v. Wong*,
575 U.S. 402 (2015)........................................17, 21, 22, 23

*Wash. Fed. v. United States*,
26 F.4th 1253 (Fed. Cir. 2022)........................................6, 7, 50, 51

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S. 155 (1980)........................................37

*Wilkins v. United States*,
598 U.S. 152 (2023)........................................23

*Wright v. Schock*,
742 F.2d 541 (9th Cir. 1984)........................................43

*Zafer Constr. Co. v. United States*,
40 F.4th 1365 (Fed. Cir. 2022)........................................15

**Federal Statutes**

28 U.S.C.
§ 250........................................29
§ 251........................................29
§ 262........................................29
§ 1295(a)(3)........................................4
§ 1491(a)(1)........................................4

§ 1500 – 1502 ........ 30
§ 2107(a) ........ 24
§ 2501 ........ *passim*

28 U.S.C. (1940 ed.) ........ 29

FRCP
12(b)(1) ........ 12, 15
12(b)(6) ........ 4, 12, 16

**Other Authorities**

Act of Mar. 3, 1863, Chapter 92
§§ 2, 10, 12 Stat. 765, 767 ........ 25

Housing and Economic Recovery Act ........ *passim*

Pub. L. No. 61–475
§ 145, 36 Stat 1087, 1136-1137 ........ 28

Rules of the Court of Federal Claims

Rule 23 ........ 33, 42, 44

# STATEMENT OF RELATED CASES

Appellants are not aware of any related cases under Rule 47.5.

## I. INTRODUCTION

This case arises from events with which this Court is familiar: the unprecedented financial crisis of 2008 and the federal government's efforts to manage it for the benefit of the American public with an unprecedented nationalization of Fannie Mae and Freddie Mac—the government-sponsored enterprises at the center of the secondary mortgage market ("GSEs"). Once it took complete control of the GSEs in September 2008, the government employed them to keep mortgage financing available, stabilize markets, and protect American taxpayers—successfully averting a meltdown of the U.S. economy.

While this nationalization provided an undeniably public benefit, it generated considerable litigation from individuals who suffered substantial property losses.[1]

While this Court may be familiar with some of the claims that have come before, it has never reviewed a claim like Appellants' claims here. Nor had *any* other court done so until the Court of Federal Claims ("CFC") dismissed Appellants' complaint.

---

[1] Numerous claims were brought by shareholders who bought GSE shares *after* the conservatorship was instituted to challenge the Government's actions as conservator. In one, a federal jury awarded over $600 million against the Federal Housing Finance Agency ("FHFA") for sweeping GSE profits into the U.S. Treasury in violation of the covenant of good faith and fair dealing. *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*, 1:13-mc-01288-RCL, ECF 421 (D.D.C. Mar. 20, 2024).

The thrust of Appellants' complaint is a distinct, direct takings claim under the Fifth Amendment: When the Government nationalized the GSEs, it confiscated Appellant Banks' mandatory capital reserves, causing regulatory insolvency and the taking of all of Appellant Banks' property, *in toto*—leaving them utterly assetless.

How did this occur? Before the enactment of HERA, the financial crisis, and the Government's nationalization, the GSEs and bank regulators sought to expand their mortgage guarantee activities but needed additional capital to do so. To avoid using taxpayer money via congressional appropriation, regulators saw the opportunity to access substantial funds held by banks in the form of mandatory financial reserves that regulators calculated and required ("Tier 1 Capital"). To that end, the Government induced community banks to convert up to 100% of their Tier 1 Capital requirements from cash and Treasury Bonds, to GSE preferred shares. Those who did so were given unique tax benefits and other incentives.

This was a stark departure from previous limitations on the composition of Tier 1 Capital, permitting only the safe and secure forms of cash and Treasury Bonds. And the strict mandate remained: failure to maintain the required value of Tier 1 Capital, at all times, would immediately result in insolvency, receivership, and confiscation of all of a bank's assets by these same regulators.

Relying on the Government's regulatory inducements and repeated

approvals, Appellants converted the majority of their Tier 1 Capital to GSE preferred shares. This understanding formed the basis of Appellants' investment-backed expectations at that time.

The subsequent nationalization of the GSEs wiped out the value of the Appellants' Tier 1 Capital instantaneously, rendering them insolvent. The result: receivership by which all of Appellants' Tier 1 Capital and all other assets held by the banks ("Total Bank Assets") were taken by the Government. This confiscation constitutes a taking of private property for an admitted public purpose, invoking Fifth Amendment protection and requiring "just compensation." Yet, Appellants have never received any compensation.

These allegations are neither conjecture nor speculation, but supported by the public admissions of multiple officials—made in hindsight after the crisis and cited in the Amended Complaint. *See, e.g.*, Appx64–72.

Rarely—if ever—will a complaint contain such detailed allegations with evidentiary support. Yet the CFC improperly dismissed the entirety of the Amended Complaint, overlooking or ignoring the specific facts pled, contrary to its obligation to assume all well-pled factual allegations as true and to credit all reasonable inferences in favor of Appellants. And as explained herein, the CFC has subject matter jurisdiction because the applicable statute of limitations is not a jurisdictional time bar under the clear-statement test, and this Court's *Bright*

decision is still good law. *Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010) (applying *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974)).

This Court must reverse the CFC based upon its de novo review.

## II. JURISDICTIONAL STATEMENT

The CFC had subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Takings Clause of the Fifth Amendment to the United States Constitution. On May 8, 2024, the CFC granted the Government's motion to dismiss under RCFC 12(b)(1) and 12(b)(6) and entered judgment dismissing Appellants' Amended Complaint.

On June 28, 2024, Appellants timely filed a Notice of Appeal. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## III. STATEMENT OF THE ISSUES

1. Whether the Tucker Act's six-year statute of limitations is tolled under Supreme Court and Federal Circuit precedent where a class action is timely filed, and plaintiffs are putative class members under the alleged class definition?

2. Whether the legal standard under Rule 12(b)(6) and Supreme Court precedent requires a CFC judge, in deciding a motion to dismiss, to consider all of the plausible factual allegations pled in the complaint in the light most favorable to the plaintiff?

3. Whether Appellants' Claims for Fifth Amendment Compensation based upon the Government taking of all of their property assets for an admitted public purpose are precluded by this Court's decision in *Washington Federal*?

4. Whether the Government is bound by an implied contract that it would not take action to destroy the value of Appellants' regulated, mandatory reserves?

## IV. STATEMENT OF THE CASE

### A. *Washington Federal* Class Action

Prior to the filing of this case, a putative class action entitled *Washington Federal v. United States* was filed in the CFC on June 10, 2013. *See* No. 1:13-cv-00385, ECF No. 1. The proposed classes included pre-conservatorship shareholders of both common and preferred stock of the GSEs. *Id.* at ¶ 192. While the class representatives and Appellants were all shareholders within the broad putative class definition, the property interests "taken" from Appellants was decidedly different in nature from those alleged by the class representatives. Those class plaintiffs did not allege a taking of all their personal assets by government action. Their claims were limited to a diminution in the value of the GSE stocks they held.

The CFC stayed proceedings in *Washington Federal* pending jurisdictional

discovery and the dismissal of a related case, *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022). *See* No. 1:13-cv-00465, ECF Nos. 1, 43–46. The CFC lifted that stay on January 12, 2018, plaintiffs filed an amended complaint, and the Government moved to dismiss. ECF No. 53. After hearing the motion, the Court again stayed *Washington Federal* pending *Fairholme.* ECF No. 82. On July 16, 2020, prior to considering class certification, the Court granted dismissal, and the class plaintiffs timely appealed. ECF No. 100, 101.

Following dismissal of *Washington Federal*, and prior to disposition on appeal, Appellants filed this case on October 1, 2021, alleging the Government's direct taking of Appellants' Total Bank Assets. Appx28–72.

On November 29, 2021, the CFC stayed this case pending the *Washington Federal* appeal. Appx73–78. On February 22, 2022, this Court affirmed dismissal of the putative class action. *Wash. Fed. v. United States*, 26 F.4th 1253 (Fed. Cir. 2022). The class plaintiffs did not seek further review, and the CFC lifted its stay.

### B. Amended Complaint

After a change in legal counsel, Appellants were granted leave to amend their original complaint (Appx79–80) and alleged the following. Appx81–151.

#### 1. Federal Regulations Mandating Tier 1 Capital Reserves

Appellant Banks were strictly regulated—a critical part of which was the Government-mandated requirement that the banks maintain "reserves," denoted as

"Tier 1 Capital," in an amount specified by the Federal Deposit Insurance Corporation ("FDIC"). See Appx93–96. Tier 1 Capital is a bank's core capital—the minimum adequate reserves determined by regulators for a bank be deemed "solvent." Appx93–94. Tier 1 Capital may be composed only of cash and Government-approved assets and is constantly monitored by banking regulators. *Id.*

Failure to maintain the value of Tier 1 Capital results in regulatory "insolvency" and the Government taking of all bank property—all assets—through receivership. Appx94. There were, historically, only two asset classes permitted by regulators to satisfy Tier 1 Capital: cash and Treasury Bonds. Nothing else. See Appx93–94. Appellants complied with these strict requirements in every respect, until the Government dramatically changed course.

2. Government's Program to Redefine Appellants' Tier 1 Capital

Congress created the GSEs to stabilize the secondary mortgage market with mortgage-backed securities. Appx90–91. The GSEs were for-profit, and publicly traded on the New York Stock Exchange until June 2010. Appx91.

The Office of Federal Housing Enterprise Oversight ("OFHEO") regulated the GSEs. In 2006, it imposed increased capital requirements of approximately $36 billion. Appx91–92. To raise this additional capital, the GSEs issued a series of preferred stock. Appx92.

Regulators approached Appellants and other banks having substantial Tier 1 Capital reserves in cash and Treasury Bonds. They approved GSE stock as an additional "equivalent" asset class and successfully induced banks to convert their Tier 1 Capital assets to GSE preferred shares. *See* Appx92–94.

The Treasury, Office of the Comptroller of the Currency ("OCC"), Office of Thrift Supervision ("OTS"), Federal Reserve, FDIC, and Internal Revenue Service ("IRS") promulgated strong financial incentives to induce this conversion. IRS rules were amended to provide an extraordinary 70% tax deduction on GSE dividends, and their value was effectively guaranteed by the OCC assigning a 20% capital risk-weight—the same weight as Treasury Bonds—based upon the "unique government relationship with Fannie Mae and Freddie Mac [and] to reflect the quasi-governmental nature of the entities." Appx92–93. The FDIC also encouraged the conversion, publicly stating that holding GSE stock did not represent a significant risk to the FDIC. Appx93.

Given the strict requirements for maintaining sufficient levels of Tier 1 Capital, and the extreme consequences of a bank's failure to do so—insolvency—the Government incentives and approval to convert was a critical regulatory and policy decision that the FDIC approved and four other regulatory agencies supported. Appx94. The Government effectively guaranteed that the GSE stock was equivalent to Treasury Bonds or cash—and that it would not take any action

that would destroy the value of Tier 1 Capital reserves it mandated. Appx37–40.

Appellant Banks relied on the FDIC's affirmation that GSE stock would safely satisfy their Tier 1 Capital requirements. Appx94. In late 2007 and early 2008—long before the enactment of the Housing and Economic Recovery Act ("HERA") or the imposition of conservatorship in late 2008—Appellants converted their Tier 1 Capital reserves to GSE shares having a combined net book value of $898,448,392. Appx97. Regulators reviewed, affirmed, certified, and approved these Tier 1 Capital investments. Appx96, Appx100.

These statements and actions taken through its various agencies, in conjunction with the catastrophic insolvency risk associated with the loss in value of Tier 1 Capital and confiscation of all bank assets, together constituted the offer, consideration, and acceptance that formed an implied contract by which the Government would refrain from regulatory or other actions that would destroy the value of the GSE shares. Appx92–97.

### 3. <u>The 2008 Conservatorship</u>

At the height of the worst financial crisis since the Great Depression, an avalanche of distressed mortgages besieged the banking industry, threatening catastrophic bank failures. To protect the banking system at "breakneck speed," the Treasury Secretary Paulson, Federal Reserve Chairman Benanke, and FHFA Director Lockhart devised a plan, explicitly approved by the President, to alleviate

the crisis. That plan included nationalization of the GSEs. Appx103–107.

On September 4, 2008, the FHFA advised the GSE Boards that they were undercapitalized and needed immediate recapitalization. Appx105. On September 5, 2008, Paulson, Bernanke, and Lockhart directed GSE representatives to consent to a government conservatorship and threatened to "seize" the GSEs if they refused. *Id.* According to Paulson, the GSE Boards did not resist and consented on September 6. Appx106. At that time, the GSEs were solvent. Fannie Mae's excess core capital was $9.4 billion, and Freddie Mac's was $2.7 billion. Appx107, Appx110. Lockhart later admitted that "[Fannie Mae] was adequately capitalized the day we put them into conservatorship." *Id.* Under conservatorship, the FHFA took total and complete control, ownership, title and interest of all GSE assets. Appx103-112.

The very next day, the conservator transferred its authority and exclusive right to terminate the conservatorship under HERA to Treasury. Appx111. This action was, in fact and effect, a nationalization of the GSEs. *See* Appx103–112.

Once in control, the Treasury infused massive amounts of liquidity to keep mortgage financing available, stabilize markets and protect American taxpayers, using the GSEs to successfully avert a meltdown of the U.S. economy. Appx111.

4. <u>The Government Nationalization Caused the Immediate Regulatory Failures of Appellant Banks and a Government Taking of All Assets</u>

With "nationalization," the GSEs stopped operating for the benefit of shareholders. Instead, the FHFA conservator succeeded to the power of the GSE Boards; restructured the GSEs to establish complete Government control; and redirected the GSEs' focus from maximizing shareholder value to providing liquidity, stability, and affordability in the mortgage market for a public purpose. Appx108–112. As a result, the monetary value of GSE stock evaporated. And with it, Appellant Banks' Tier 1 Capital. Appx114–115.

The loss in value of their Tier 1 Capital rendered seven of the nine Appellant Banks immediately insolvent. Appx122. The Government placed each of them into receivership and took all of their assets—a total confiscation of personal, private property. Appx117–125. For the two other Appellant Banks that remained solvent, the Government invoked a rarely used authority to place them in receivership as well. Appx122. The result: the Government directly took Appellant Banks' "Total Bank Assets." Appx122–123.

### C. <u>The CFC Dismisses the Amended Complaint</u>

The Government and Appellants spent the greater part of 2023 briefing the Government's motion to dismiss the Amended Complaint. On March 11, 2024, the CFC heard extensive oral argument from both sides. On May 8, 2024, the CFC issued an order granting the Government's motion in its entirety by adopting the Government's positions on all issues. Appx1–18.

First, the CFC determined that it lacked subject matter jurisdiction over the controversy and dismissed this case under Rule 12(b)(1) finding—for the first time in this Circuit—that the Supreme Court abrogated this Court's decision in *Bright* that *American Pipe* tolling applied under the Tucker Act based on a case that the Supreme Court handed down 7 years ago. As a result, the CFC held that *Washington Federal* did not toll the statute of limitations as to Appellants Claims.

Second, even assuming jurisdiction and tolling, the CFC dismissed Appellants' complaint under Rule 12(b)(6) for failure to state a claim. The CFC decided that (1) *Washington Federal* precluded Appellants' takings claims, (2) Appellants' complaint failed to state a Fifth Amendment takings claim under binding precedent, and (3) Appellants' complaint did not state a breach of contract or implied contract claim.

Appellants filed a Notice of Appeal on June 28, 2024. Appx431–434.

## V. <u>SUMMARY OF THE ARGUMENT</u>

Put simply, the CFC ignored its well-settled obligations in evaluating a motion to dismiss: to assume the veracity of all well-pleaded factual allegations, construe all reasonable inferences in favor of plaintiffs, and determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). The CFC failed to consider and credit, among others, *any* of Appellants' allegations directed to the complete taking of the Appellants' Total

Banks' Assets. Instead, it hyper-focused on selected allegations related to Appellants' GSE holdings and superficially read Appellants' claim as precluded by *Washington Federal*.

But *Washington Federal*, a putative class action brought by three "pre-conservatorship" shareholders, alleged a constitutional taking based ***solely and exclusively*** upon the loss in value of the GSE stock they continued to hold. That case was dismissed ***prior to class certification***, and this Court affirmed. This Court found, *inter alia*, that the class representative shareholders whose stock simply lost value, failed to plead a compensable property interest as a basis for a Fifth Amendment taking claim.

How does Appellants' case differ? Substantially, on the issue of "compensable property." While holders of GSE shares—and included in *Washington Federal*'s broad putative class definition—Appellants were regulated banks, and the "property interest" confiscated by government action was all of their assets *in toto*—a taking that the *Washington Federal* class representatives did not allege.

The CFC neither recognized nor credited this distinction and erroneously dismissed Appellants' claims, citing "claim preclusion" and "binding precedent."

The CFC also failed to consider the procedural idiosyncrasies of class actions. Not all putative class members' claims were identical in terms of time of

purchase, loss, or the specific property taken. Appellants' claim of the taking of Total Banks Assets was never considered—let alone resolved—by the CFC or this Court in *Washington Federal*. Because *Washington Federal*'s dismissal occurred at the outset, Appellants were absent class members who had no opportunity to present their individualized claims on the merits. This is the risk that the Government took by seeking a pre-certification dismissal: absent class members are not precluded from bringing their individual claims later.

Furthermore, unlike *Washington Federal*, Appellants' claimed harm is theirs alone; it can in no way be considered harm to the GSEs, which had no property interest in Appellants' Total Bank Assets. Nor does the fact that the claims arise in the context of a "highly regulated" industry vitiate Appellants' constitutional protections. The claims are direct and non-derivative. Simply put, Appellants have pled a valid Fifth Amendment taking claim.

If the Government had confiscated Appellant Banks' Tier 1 Capital reserves ***in any other form***, then there would be no question that Appellants sufficiently alleged a cognizable taking claim. For example, if the Government confiscated Tier 1 Capital comprised of Treasury Bonds, by devaluing or deciding to dishonor them, then that "taking" would unquestionably require just compensation. *See Ambase Corp. v. United States,* 58 Fed.Cl. 32, 51 (2003) ("even in an area regulated as heavily as banking, numerous possible government actions would

invoke the Fifth Amendment.”)

First, though, this Court must reverse the CFC’s Rule 12(b)(1) dismissal. After that dismissal, the Supreme Court held that it now demands all time bars other than the time to notice an appeal pass the clear-statement test before a court can treat an untimely filing as jurisdiction stripping. *Harrow v. Department of Defense*, 601 U.S. 480, 482, 484, 488–89 (2024). No court has subjected the Tucker Act’s time bar to that test, and this Court must now do so. Because the Tucker Act’s time bar fails that test, this Court must reverse the CFC’s jurisdictional ruling. In addition, or in the alternative, the CFC’s jurisdictional ruling was predicated upon an erroneous reading of two Supreme Court cases – *Sand* and *CalPERS*—and an erroneous reading of this Court’s decision in *Bright*. Properly construed, those cases do not support the CFC’s jurisdictional ruling. *Calif. Public Employees’ Retirement Sys. v. ANZ Securities, Inc.*, 582 U.S. 497 (2017); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008); *Bright*, 603 F.3d 1273.

## VI. ARGUMENT

### A. Standard of Review

This Court reviews dismissals for lack of subject-matter jurisdiction and for failure to state a claim *de novo*. *Taha v. United States*, 28 F.4th 233, 237 (Fed. Cir. 2022); *Zafer Constr. Co. v. United States*, 40 F.4th 1365, 1367 (Fed. Cir.

2022).

In reviewing a Rule 12(b)(6) dismissal *de novo*, this Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). This is a "'context-specific task that requires the *reviewing court* to draw on *its* judicial experience and common sense'" to determine "'whether respondent's complaint has the "heft" to state a claim.'" *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 40 (Fed. Cir. 2024) (quoting *Iqbal*, 556 U.S. at 674, 679 (emphasis original) (vacating-in-part dismissal after determining claims were sufficiently pleaded).

"'Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings.'" *Hardy v. United States*, 965 F.3d 1338, 1344 (Fed. Cir. 2020) (quoting *Cary v. U.S.*, 552 F.3d 1373, 1376 (Fed. Cir. 2009)). Accordingly, this Court "review[s] de novo the existence of a compensable property interest." *Id.*. Where, as here, a determination has occurred under Rule 12(B)(6), the *de novo* inquiry requires that "the facts…be accepted as alleged." *Cary*, 552 F.3d at 1376.

## B. The Court of Federal Claims Has Subject-Matter Jurisdiction

### 1. Section 2501 Must Now Pass the Clear-Statement Test

Meeting a jurisdictional deadline is a condition precedent to a court's power

over a controversy. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 297 (2023). A default under a jurisdictional deadline usually leaves a court "completely powerless" to excuse it. *McIntosh v. United States*, 601 U.S. 330, 337 (2024). To protect court power over controversies, the Supreme Court began development of its "clear-statement test" in 2006. *Arbaugh v. Y&H Corp.*¸ 546 U.S. 500, 515 (2006). Under the clear-statement test, Congress must "unmistakably" instruct courts when to treat conditions to filing suit as jurisdictional. *Santos-Zacaria v. Garland*, 598 U.S. 411, 416–17 (2023).

In 2008, the Supreme Court stated that the Tucker Act's statute of limitations ("Section 2501") was "more absolute" than other statutes of limitation and held that the Government could not waive it. *Sand*, 552 at 133–34 (analyzing 28 U.S.C. § 2501). *Sand* did not use the clear-statement test and based its holding on judicial fiat alone. *See United States v. Wong*, 575 U.S. 402, 416–17 (2015)("What is special about the Tucker Act's deadline, [*Sand*] recognized, comes merely from this Court's prior rulings, not from Congress's choice of wording.").[2]

[2] The Supreme Court did not use the clear-statement test when deciding that the deadline to file a notice of appeal from one Article III court to another was jurisdictional in *Bowles v. Russell*, 551 U.S. 205, 210–213 (2007). The Supreme Court has fought over placing *Bowles* within the *Arbaugh* framework. *Compare Bowles*, 551 U.S. at 221 (Souter, *J.*, dissenting) *and Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), *with id.*, at 559 U.S. at 172 (Ginsburg, *J.*, dissenting). This year, the Supreme Court ended that fight by characterizing *Bowles* as the one

*Sand*, however, did not hold that Section 2501's filing deadline was impervious to all tolling rules. *See Bright v. United States*, 603 F.3d 1273, 1287–290 (Fed. Cir. 2010)(applying *American Pipe*, 414 U.S. 538, and its progeny, notwithstanding *Sand*). In *Bright*, almost 15 years ago, this Court held that the Supreme Court's *American Pipe* tolling rule could pause Section 2501's filing deadline while acknowledging *Sand*'s recognition that Section 2501 was "jurisdictional in nature" and "forbids a court to consider whether certain equitable considerations warrant extending." *Id.* at 1277–78; 1287–90. Since *Bright*, absent class members – including Appellants – have relied on *American Pipe* to pause Section 2501's filing deadline to consider whether a putative class action protected their interests or whether to pursue them individually.

Seven years after *Bright*, the Supreme Court stated that the "balance of the Court's reasoning" in *American Pipe* "reveals a [tolling] rule based on traditional equitable powers" and held that *American Pipe* cannot extend the filing deadline in the Securities Act of 1933's statute of repose. *CalPERS*, 582 U.S. at 510–11. The CFC below applied erroneous broad readings of *CalPERS* and *Sand* to an erroneous narrow reading of *Bright* to conclude that the Supreme Court abrogated *Bright* seven years ago. Based on those errors, the CFC concluded that *American*

---

*Arbaugh* exception. *Harrow v. Department of Defense*, 601 U.S. 480, 484, 488–489 (2024).

*Pipe*'s tolling rule cannot pause Section 2501's filing deadline and dismissed for lack of subject matter jurisdiction.

After the CFC dismissed this case, the Supreme Court reversed and remanded this Court's treatment of another filing deadline as jurisdictional in *Harrow v. Department of Defense*. A unanimous decision, *Harrow* demands that all time bars except for the one analyzed in *Bowles*, *see supra* note 2, pass the clear-statement test before taking all equitable exceptions off the table.

> The Government identifies one kind of time limit that counts as jurisdictional, but we have already made plain its exceptional nature.[[3]] . . . *Bowles* governs statutory deadlines to appeal "from one Article III court to another." *Hammer v. Neighborhood Housing Servs. of Chicago*, 583 U.S. 17, 25, 138 S.Ct. 13, 199 L.Ed.2d 240 (2017). **As to all other time bars, we now demand a "clear statement."** *Id.*, at 25, n.9, 138 S.Ct. 13. This case falls outside **the *Bowles* exception** because Harrow appealed to the Federal Circuit not from another court but from an agency.

601 U.S. at 488-89 (some internal citations omitted) (emphases added).

Because *Sand* did not use the clear-statement test to determine whether Section 2501 imposes an absolute jurisdictional time limit, this Court must now do so in the first instance.[4] Because Section 2501 does not pass that test, a Section

[3] The Government also identified the Tucker Act's statute of limitations as a jurisdictional time bar, citing *Sand*. *See* Gov't Br. at 27, *available at* https://www.supremecourt.gov/DocketPDF/23/23-21/300440/20240212193041096_23-21bsUnitedStates.pdf (last visited Dec. 4, 2024). *Harrow* does not cite *Sand*, recognize a *Sand* exception, or describe a general *stare decisis* exception.

[4] *See ECC International Constructors, LLC v. Secretary of Army*, 79 F.4th 1364,

2501 default does not leave a court powerless to pause its deadline, and *American Pipe* tolling applies whether it is statutory or equitable.

2. <u>Section 2501 Fails the Clear Statement Test</u>

Meeting a statutory filing deadline is a condition precedent to jurisdiction only if Congress "clearly states" that it is. *Harrow*, 601 U.S. at 484. Congress need not use "magic words," but the "demand for a clear statement erects a 'high bar.'" *Id.* (quoting *Wong*, 575 U.S. at 409). Traditional tools of statutory construction can reveal a clear statement only if those tools "plainly show that Congress imbued [the statute] with jurisdictional consequences.'" *Id.* (quoting *Wong*, 575 U.S. at 409). "But the statement must indeed be clear; it is insufficient that a jurisdictional reading is 'plausible,' or even 'better,' than nonjurisdictional alternatives." *MOAC*, 598 U.S. at 298 (citing *Boechler, P.C. v. Commissioner of Internal Revenue*, 596 U.S. 199, 206–07 (2002)). Where multiple plausible interpretations exist and the better interpretation makes the filing deadline jurisdictional, "better is not enough." *Boechler*, 596 U.S. at 205–07.

---

1372-1373 (Fed. Cir. 2023) (noting in "recent intervening years . . . the Supreme Court has provided significant additional guidance to clarify when rules should be considered jurisdictional" to reconsider prior panel decisions that did not use that guidance (citing *Cal. Inst. of Tech. v. Broadcom, Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022) (declining to follow prior decisions in light of later Supreme Court guidance); *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (same); *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235-36 (Fed. Cir. 2019) (same)).

The court should first analyze the text's language and consider its context, including the Supreme Court's interpretations of similar provisions in many years past, as probative of Congress's intent. *See Hammer*, 583 U.S. at 25 & n.9 (citing *Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145, 153 (2013). The "text of a law controls over purported legislative intentions unmoored from any statutory text," and the court "may not replace the actual text with speculation as to Congress's intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 344 (2010)). "[M]ost time bars are nonjurisdictional," even if "framed in mandatory terms. *Harrow*, 601 U.S. at 484 (citation omitted).

a. <u>Section 2501's Text Does Not Provide a Clear Statement</u>

Section 2501 provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501. The Supreme Court has "twice . . . made clear that the jurisdictional status of [Section 2501] has previous little to do with its phrasing." *Wong*, 575 U.S. at 413–416.

Section 2501's use of the word "jurisdiction" does not make it a clear statement from Congress that its filing deadline is jurisdictional. *See Steel Co v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998). And the Supreme Court

refuses to treat the phrase "shall be barred" as jurisdiction stripping. *American Pipe* itself did not consider the Clayton Act's use of "shall be forever barred" as a tolling bar. *Wong*, 575 U.S. at 413 (citing *American Pipe*, 414 U.S. at 559). Even where a statute was "emphatic" that a "tort claim against the United States shall be forever barred" unless "presented within two years," the Supreme Court concluded that it "saw no sign that Congress meant to give the time bar jurisdictional consequence." *Harrow*, 601 U.S. at 484 (analyzing *Wong*, 575 U.S. at 411). That statute "was just a time limit, nothing more." *Id.*

Section 2501's text is not a clear statement from Congress that unmistakably instructs courts to treat its filing deadline as a condition precedent to jurisdiction. *Wong*, 575 U.S. at 416–17 ("What we have done is to say, again and again, that the core language in that provision has no jurisdictional significance.")

b. Statutory Context Does Not Provide a Clear Statement

Section 2501's statutory context does not make its filing deadline a jurisdictional precondition. Congress codified the Tucker Act's grant of CFC jurisdiction in Part IV of Tile 28 of the United States Code ("Jurisdiction and Venue") under Chapter 91 ("pertaining to the jurisdiction and venue of the United States Court of Federal Claims"). The grant of jurisdiction neither refers to a statute of limitations nor does it create any time-based condition precedent that withdraws the power to determine claims in the event a petitioner suffers a time-

based default. *Wong*, 575 U.S. at 412 ("Nothing conditions the jurisdictional grant on the limitations perio[d], or otherwise links those two provisions."). Congress instead codified Section 2501 ("Time for Filing Suit") in Part VI of the United States Code ("Particular Proceedings") under Chapter 165 ("United States Court of Federal Claims Procedure"). *See INS v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

Because Congress granted the CFC power to hear claims in a part, chapter, and section far afield from the filing deadline, statutory context does not make Section 2501 a clear statement from Congress that an untimely filing is jurisdiction stripping. *Wong*, 575 U.S. at 411 ("This Court has often explained that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." (multiple citations omitted)); *see Harrow*, 601 U.S. 480; *Wilkins v. United States*, 598 U.S. 152 (2023); *Sebelius*, 568 U.S. at 155 (stating requirement "does not become jurisdictional simply because it is placed in a section of a statute that also contains jurisdictional provisions"); *Fort Bend County, Texas v. Davis*, 587 U.S. 541, n.9 (2019) ("[A] nonjurisdictional provision does not metamorphose into a jurisdictional limitation by cross-referencing a jurisdictional provision" (citation omitted).

### c. Historical Context Does Not Clarify Congressional Intent

While it is true that the Supreme Court has stated that it will leave undisturbed its prior treatment of a statute as jurisdictional "when a long line of [Supreme] Cour[t] decisions left undisturbed by Congress" attached a jurisdictional label to the prescription, that statement comes from the Supreme Court's description of its justification for treating the time deadline in *Bowles* as jurisdictional. *See Fort Bend County*, 587 U.S. at 548 (citing *Union Pacific R. Co. v. Locomotive Engineers*, 558 U.S. 67, 82 (2009)); *Union Pacific*, 558 U.S. at 82 ("In contrast, relying on a long line of this Court's decisions left undisturbed by Congress, we have reaffirmed the jurisdictional character of the time limitation for filing a notice of appeal stated in 28 U.S.C. § 2107(a)." (citing *Bowles*, 551 U.S. at 209–11)). As shown above, *Harrow* confirms *Bowles* is the one exception to the clear-statement test, and judicial fiat alone cannot make any other time bar jurisdictional. Placed within the clear-statement test, the precedent discussed in *Sand* and *Sand* itself does not make Section 2501 a clear statement and is not probative of Congressional intent that courts treat Section 2501's filing deadline as an absolute condition precedent to jurisdiction.

#### (i) Nineteenth Century Cases Used Equitable Tolling

In *Kendall v. United States*, 107 U.S. 123 (1883), the statute in question provided a list of legal disabilities that could pause the statute of limitations and

provided that the Court did not have the power to render judgment on behalf of a former supporter of the Confederacy, which the petitioner in that case was. A clear statutory provision did not allow the court to enter judgment on behalf of the petitioner, and the exclusive list of legal disabilities that Congress allowed to pause the statute in question did not include being a former – but now forgiven – supporter of the Confederacy.[5] In *Kendall*, Justice Harlan suggested that equity might play a role in excusing a time default if the Government had caused it. *Id.* at 126. Indeed, the Court had done just that a few years earlier.

In *United States v. Lippitt*, 100 U.S. 663, 669 (1880), the Supreme Court found jurisdiction to consider claims referred from an executive department more than 6 years after it had accrued where the petitioner had brought the claim to the appropriate executive department within six years of its accrual. In that case, a petitioner submitted his claim to an executive department for settlement within 6 years of its accrual, after which Congress passed an act that permitted the executive department to refer the claim to the court of claims for adjudication. The executive department did that more than six years after the claim accrued, and the Attorney General argued that the statute of limitations prohibited the court of claims from exercising jurisdiction over it. The Court rejected that attempt:

> We are satisfied that the delay was accidental, certainly not with any intention to defraud or injure the claimant. If

[5] *See* Act of Mar. 3, 1863, ch. 92, §§ 2, 10, 12, 12 Stat. 765, 767.

> the plea had, upon its face admitted, or if the fact was established by competent evidence, that the delay in deciding or in referring the claim to the Court of Claims was intentional, or with a purpose to defeat the claimant, by limitation, the court would certainly not permit the government to profit from such a course. Why should a different conclusion be reached when the delay is unexplained, and is inconsistent with proper diligence in the transaction of the public business?
>
> It seems to the court that, looking at the purpose which Congress had in the establishment of the Court of Claims, and in enlarging its powers, as indicated in the acts of 1863 and 1868, the just and reasonable construction of the tenth section of the first named act [the six-year filing deadline] requires us to hold that limitation is not pleadable, in the Court of Claims, against a claim cognizable therein, and which has been referred by the head of an executive department for its judicial determination, provided such claim was presented for settlement at the proper department within six years after suit could be commenced thereon against the government. Where the claim is of such a character that it may be allowed and settled by an executive department, or may in the discretion of the head of such department, be referred to the Court of Claims for final determination, the filing of the petition should relate back to the date when it was first presented at the department, for allowance and settlement. In such cases, the statement of facts, upon which the claim rests, in the form of a petition, is only another mode of asserting the same demand which had previously and in due time had been presented at the proper department for settlement.

*Id.* at 668. Justice Harlan created an equitable tolling principle that no statute expressly authorized and would not "concur in . . . a construction [that] would work an injustice which we cannot suppose Congress intended" because the result "should not be sustained unless we are required to do so by some absolute

unbending rule of construction." *Id.* at 667. Justice Harlan, it seems, was an early adopter of *Arbaugh*. His *dictum* that he would not apply the statutory deadline in circumstances where the Government's intentional acts prevented the timely filing also suggests that Justice Harlan believed the filing deadline to be subject to some equitable tolling. *See MOAC*, 598 U.S. at 298 ("But not even such egregious conduct by a litigant would permit the application of judicial estoppel as against a jurisdictional rule.")

Building on *Lippett*, Justice Harlan in *Finn v. United States*, 123 U.S. 227 (1887) refused to allow a claim that had been presented to an executive department 10-years after its accrual, suffered multiple adverse rulings, and then transferred to the Court of Claims for adjudication after it had been reopened. On those facts, the Court refused to extend the time for filing. In *Finn*, no equitable considerations were raised to justify the late filing. Indeed, in analyzing the case, *Sand* hypothecated an equitable argument that was not raised and acknowledged that *Lippett* was contrary authority for its hypothetical proposition. *Sand*, 552 U.S. at 134–35 ("The Government reference, **it might have been argued**, amounted to a waiver by the Government of a limitations-based defense. *Cf. United States v. Lippett*, 100 U.S. 663, 669, 15 Ct.Cl. 622, 25 L.Ed. 747 (1880) (reserving the question of the time bar's application in such circumstances)."). In another case cited in *Sand*, the Supreme Court cited *Lippett* for its tolling principle. *See United*

*States v. New York*, 160 U.S. 598, 616-619 (1886). Of course, these Nineteenth Century cases cannot make Section 2501 a clear statement in light of the material changes that Congress made to it in the Twentieth Century.

d. Congressional Action in 1911, 1940, and 1948 Support Appellants

Congress changed the historical analogue to Section 2501 that *Sand*'s Nineteenth Century precedent analyzed in material ways that support Appellants. Under the Judicial Code of 1911, Congress recodified the deadline to file a claim in the court of claims that further uncoupled the filing deadline from its grant of jurisdiction. When it did so, Congress retained the Court's holding in *Kendall* by carving out from the jurisdictional grant the power to hear claims "growing out of the late civil war" or to reopen stale claims that "prior to March third, eighteen hundred and eighty seven, had been rejected or reported on adversely by any court, department or commission authorized to hear and determine" as tried in *Finn*.[6] Section 156 then provided the filing deadline and an exclusive list of disabilities that might toll it.[7] For claims after 1887, however, *Lippitt* seems retained.

Furthermore, the Judicial Code of 1911 shows that Congress knew how use a lapse oof time to withdraw jurisdiction:

> The district courts shall have original jurisdiction as follows:

[6] Act. of Mar. 3, 1911, Pub. L. No. 61–475, § 145, 36 Stat 1087, 1136-1137.
[7] *Id.* at § 156, 36 Stat. 1087, 1139.

> Twentieth: Concurrent with the Court of Claims, of all claims not exceeding ten thousand dollars founded upon the Constitution . . . **And provided further, That no suit against the Government of the United States shall be allowed under this paragraph unless the same shall have been brought within six years after the right accrued for which the claim is made . . . .**.[8]

Congress knew how to tie a filing deadline to a grant of jurisdiction such that the lapse of time extinguished a court's power over a controversy but did not do it for the Court of Claims.

Congress's recodification of these provisions in 1940 emphasizes the point. Congress gave the court of claims power to hear certain claims in Sections 250, 250a, and 250b. Section 251 ("Jurisdiction not to extend to certain claims") provided:

> The jurisdiction of the Court of Claims shall not extend to include any claim against the United States based upon or growing out of the destruction or any property or damage done to any property by the military or naval forces of the United States during the war for suppression of the rebellion; nor to any claim for stores and supplies taken or furnished to or for the use of the military or naval forces of the United States, nor to any claim for the value of any use and occupation of any real estate by the military or naval forces of the United States, nor to any claim for the value of any use and occupation of any real estate by the military or naval forces of the united States during said war; nor shall said Court of Claims have jurisdiction of any claim which on March 4, 1915, was barred by the

[8] *Id.* at § 24 ¶ 20, 36 Stat. 1087, 1091, 1093.

provisions of any law of the United States.[9]

Section 262 then provided the six-year filing deadline. If Congress intended to use the filing deadline under Section 262 as a condition precedent to the jurisdiction of the court of claims, providing a section that withdrew jurisdiction for any claim that was barred under any law as of 1915 is superfluous as does barring claims arising from the Civil War.

Finally, the 1948 recodification made three additional changes. First, the jurisdiction provisions were moved to a different part of the United States Code, and Section 2501 remained under a part identified for court of claims procedure. *See supra* at VI.2.b. The jurisdiction part includes sections that remove jurisdiction to hear certain classes of claims. 28 U.S.C. §§ 1500 – 1502. With respect to the filing deadline, Congress removed the word "forever" and eliminated the exclusive list of disabilities that could delay the start of the limitations period in favor of a more general statement that provided an additional three years to file claims after the disability ceases. 28 U.S.C. § 2501.

e. Post 1948 Cases Do Not Provide a Clear Statement

In *Soriano v. United States*, 352 U.S. 270 (1957), the one post-1948 case cited in *Sand*, the Supreme Court, relying on *Kendall*, without considering *Lippett* and its progeny or the subsequent Congressional changes to the relevant statute

[9] 28 U.S.C. (1940 ed.) §§ 250, 250a, 250b, 251, 262.

outlined above, rejected petitioner's request that World War II toll the statute of limitations in his case. The Supreme Court did not want to create a tolling doctrine that could extend all limitations period because of World War II and did not feel it had to do so because the petitioner waited more than three years after World War II to sue. *Id*. at 275-276. *Soriano*'s holding was a narrow rejection of a fact-specific tolling request.

*Sand* itself does not make Section 2501 a clear Congressional statement that its filing deadline was an absolute condition precedent that foreclosed all equitable tolling. As explained above, many of the cases it relied upon allowed for it. And *Sand* itself, as this Court has recognized, was a limited and narrow holding that relied on stare decisis to conclude that Section 2501 cannot be waived.

After *Harrow*, this Court can only affirm the CFC's decision to dismiss for want of jurisdiction if Section 2501 passes the clear-statement test. Section 2501's text does not provide a clear statement, its statutory context supports Appellants, and historical context—including Supreme Court precedent–do not make Congressional intent clear. The historical cases cited in *Sand*, *Sand's* recognition of *Lippett*'s use of equity to extend limitations, the history of Section 2501's text, and the limited holdings of *Soriano* and *Sand* do not make Section 2501 a clear statement of Congressional intent. "This is not the stuff of which clear statements are made." *MOAC*, 598 U.S. at 299. The CFC, therefore, had the power to apply

*American Pipe* tolling in this case, whether *American Pipe*'s tolling doctrine is equitable or statutory. The Court should not treat Section 2501's filing deadline as jurisdictional because doing so allows Congress to abrogate and restrict a core Constitutional right—the only right for which the Constitution itself guarantees a monetary remedy. If Congress can extinguish the Court's power to hear such claims after 6 years, why not 1? The Supreme Court does not allow Congress to abrogate core rights in that fashion. *See*, *infra*, VI.C.1.

3. *CalPERS* Did Not Abrogate *Bright*

In addition, or in the alternative, the CFC erred by holding that *CalPERS* abrogated *Bright*. First, *Sand* stated that Section 2501 was a "more absolute" statute of limitations such as those that cannot be waived or that take "certain equitable considerations.". *Sand* held only that Section 2501 was like the "more absolute" deadlines because, as had been held in prior cases, the Government could not waive it. 552 U.S. at 133–134. *Sand* did not hold that all equitable considerations were off the table, nor could it. *See supra*. *Sand* did not hold that Section 2501 precluded the tolling principle articulated in *American Pipe*. *Sand* did not involve a statute of repose, like in *CalPERS*, involve class actions or class-action tolling, and does not make *American Pipe* one of the "equitable considerations" unavailable under Section 2501.

Second, in *Bright*, this Court allowed *American Pipe* tolling because its

tolling principles were not "equitable" in the sense of allowing a late-filed claim out of fairness for a petitioner who was prohibited from filing timely. *See Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (describing traditional equitable tolling principles as allowing late claims when some "extraordinary circumstance" prevented claimant from a timely filing). Instead, it allowed the tolling principle outlined in *American Pipe* because that tolling principle effectuated the purpose of class actions without which class actions against the Government would fail. *Bright*, 603 F.3d at 1288–90.

Third, the Supreme Court recognizes material differences between statutes of limitation and statutes of repose. *CTS Corp. v. Waldburger*, 573 U.S. 1 (2014). The Supreme Court's analysis of *American Pipe* under *CalPERS* says nothing about whether the Supreme Court would find a court lacked the power to apply *American Pipe* to Section 2501. The Supreme Court was careful to limit the *CalPERS* precedent to its facts and the statute that it analyzed. 582 U.S. at 505–07.

The CFC erred because it expressly treated Section 2501 as akin to a statute of repose and *American Pipe* tolling as the type of equitable consideration that certain jurisdictional statutes prohibit when it is not. The CFC also erred in adopting a broad reading of *CalPERS* that did not respect that case's self-imposed limits. The CFC compounded these errors in rejecting this Court's ***en banc*** admonition that *Sand* was a narrow holding. *Bright*, 603 F.3d at 1287 ("As this

court recently noted en banc, the issue in *[Sand]* was narrow.") Based on these errors, the CFC reached a conclusion that destroys the viability of CFC Rule 23's class-action regime. That result is neither necessary nor desirable. This Court need not and should not affirm it.

4. *American Pipe* Tolling Applies in this Case

In the CFC below, the Government argued that *American Pipe* would not apply to this case under *Bright* because the CFC never certified the class in *Washington Federal*. The Government made that argument based on one inapplicable CFC case, *Big Oak Farms, Inc. v United States*, 141 Fed. Cl. 482 (2019). The CFC declined to reach that argument in a footnote. This Court should not credit this argument should the Government raise it here again on appeal. *Big Oak* is inapposite. In that case, the CFC declined to allow new plaintiffs to join the case after the original plaintiffs having had sufficient time to move for class certification abandoned the class action allegations and amended the complaint. *Id.* at 485 ("Plaintiffs did not follow the court's class action procedure in this case and thus *Bright* does not apply."). The *Washington Federal* plaintiffs never had an option to move for class certification because the case was stayed for efficient administration while other similar cases worked their way through court system and the Government's early motion to dismiss. In *Washington Federal*, though, case proceeded until it was stayed pursuant to class action procedures and the CFC

did appoint interim class counsel and issue an order that would have consolidated any other class action brought by a putative member of the *Washington Federal Class* with *Washington Federal* and make *Washington Federal* the operative complaint. 13-cv-00385, ECF 28 (Oct. 29, 2013). In these circumstances, *Big Oak* is unpersuasive, and it makes no difference whether a class was certified yet. *See Toscano v. United States*, 98 Fed. Cl. 152 (2011); *Geneva Rock Products, Inc. v. United States*, 100 Fed. Cl. 778 (2011) (noting that *Bright* applied when the plaintiff actually informed the court (and defendant) that it sought class certification by filing a properly-worded complaint and that "*Bright*'s tolling . . . was contingent not on a motion for class certification, but rather on plaintiff's seeking class certification which may be done through class-action allegations in the complaint."); *accord Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 840–41 (7th Cir. 2017).

### C. Appellants Sufficiently Stated a Direct Taking Claim

Appellants' property interests, as factually pled in detail, are distinct and fall squarely and explicitly within the protections guaranteed by the Fifth Amendment under longstanding jurisprudence.

#### 1. Total Bank Assets Constitute a Valid Compensable Property Interest Under the Fifth Amendment

"Private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The government cannot "forc[e] some

people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). It "prevents the public from loading upon one individual more than his just share of the burdens of government and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 325 (1893).

"We have recognized … that no magic formula enables a court to judge … whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests . . . ." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). "[D]ue to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously." *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005).

Whether the plaintiff has identified a property interest cognizable under the Fifth Amendment is a "bedrock requirement." *Leider v. United States.*, 301 F.3d 1290, 1295 (Fed. Cir. 2002). A court must determine whether the "asserted right is one of the rights in the bundle of sticks of property rights that inheres in a *res* by looking to 'existing rules or understandings' and 'background principles' derived from an independent source such as state, federal, or common law." *Am. Pelagic*

*Fishing Co. v. United States*, 379 F.3d 1363, 1376 (Fed. Cir. 2004) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)). Courts "also look to 'traditional property law principles,' plus historical practice and this Court's precedents."' *Tyler v. Hennepin Cty.*, 598 U.S. 631, 638 (2023) (citations omitted).

The focus is on the nature of the citizen's relationship to the property: whether they had a right to exclude, use, transfer or dispose of it. *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

Contrary to the decline in stock value alleged by the putative *Washington Federal* representatives, Appellants identify their compensable property interest as their Total Bank Assets—all of the property they owned—whether associated with GSE stock or otherwise. Appx126-131. To put it bluntly, all of Appellants' property, all of their assets—lock, stock, and barrel—were taken as a direct result of actions by the highest level of government.

These assets comprised specific bank-owned monetary funds. A property interest in a *specific fund* of money is compensable property under the Takings Clause. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160–65 (1980); *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 163–72 (1998); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231–41 (2003).

That some of the Total Bank Assets taken were comprised of GSE stock is of no consequence. Appellants' GSE stock constituted, by government edict, and

for all regulatory and accounting purposes, the Banks' Tier 1 Capital property. The Supreme Court has extended *per se* protection under the Fifth Amendment to just such property. See *Monongahela*, 148 U.S. at 344–45 (company entitled to compensation for franchise to collect tolls in addition to compensation for the bridge taken); *Gen. Motors,* 323 U.S. at 383–84 (because "destruction is tantamount to taking," owner entitled to compensation for fixtures and equipment destroyed or depreciated by taking of a warehouse); *Armstrong*, *supra*, 364 U.S. at 45–46 (lien interest in building materials was a "compensable property interest" taken when the government took title to the uncompleted ships and all building materials.).

The Fifth Amendment holds the government strictly liable for the direct taking of private property interests. Here, the taking of the Banks' Tier 1 Capital and other Total Bank Assets were inextricably linked. The destruction of the value of the Tier 1 Capital required, *ipso facto*, the taking of the Total Bank Assets through insolvency and receivership. Representatives from each of the government agencies involved have admitted these allegations are factually correct. Appx95, Appx107, Appx124.

At the time of the investment, Appellant Banks were both certified and induced to include unlimited amounts of GSE preferred shares in the composition of Tier 1 Capital. Thus, far from precluding the formation of a property right, these

express government requirements and incentives created the very Tier 1 Capital that was Appellants' private property.

Moreover, the Supreme Court has repeatedly confirmed that a federal statute, like HERA, may not be construed to eliminate Fifth Amendment rights. *See Tyler*, 598 U.S. at 638 ("'[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take.'" (citation omitted)); *Jacobs v. United States*, 290 U.S. 13, 17 (1933) ("[T]he right to just compensation could not be taken away by statute."); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) ("Just compensation is provided for by the Constitution and the right to it cannot be taken away by statute." (citing *Monongahela*, 148 U.S. at 327)); *Phelps v. United States*, 274 U.S. 341, 344 (1927) ("Acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution.")

This is a case of "live by the sword, die by the sword." The Government created and defined the specific property interest at issue—Tier 1 Capital with its mandatory insolvency, receivership, and total asset forfeiture requirements—then, by its own regulatory sword, destroyed the value of what it created. Even for the most benevolent public purpose, the Government cannot dodge the constitutional guarantee of just compensation.

2. Appellants Sufficiently Alleged Government Action Constituting A Complete Taking of Total Bank Assets

After identifying a valid property interest, "the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Am. Pelagic*, 379 F.3d at 1372. A regulatory action becomes a compensable taking under the Fifth Amendment if the government interference has gone "too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

*Armstrong* controls. At the time the government confiscated all of the construction materials, the supplier liens on the materials held by Armstrong were still valid, and therefore, the "taking" resulted in a destruction ***of the value*** of all Armstrong's property rights under their liens:

> The total destruction by the Government ***of all value of these liens***, ***which constitute compensable property,*** has every possible element of a Fifth Amendment "taking," ***and is not a mere*** "consequential incidence" of a valid regulatory measure. Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. ***It was because the Government, for its own advantage destroyed the value of the liens*** . . . . Since this acquisition was for a public use, ***however accomplished, whether with an intent and purpose of extinguishing the liens or not,*** the Government's action ***did destroy them*** and in the circumstances of this case ***did thereby take the property value*** of those liens within the meaning of the Fifth Amendment. . . . A ***fair interpretation*** of this constitutional ***protection entitles these lienholders to just compensation*** here. *Cf. Thibodo v. United States,* 9 Cir., 187 F.2d 249.

*Armstrong,* 364 U.S. at 49 (emphasis added).

Here, before the government destroyed the value of the banks' Tier 1 Capital, the Appellant Banks had compensable property—substantial bank assets. Afterwards, they had none. All was lost. Appellants alleged, in detail, a complete appropriation of all of Appellants' monetary personal property, a *per se* taking as a matter of law.

### D. Appellants' Taking Claim is Not Precluded by *Washington Federal* Because They Were Absent Class Members and There Was No Class Certification

The CFC's conclusion—made without support—that Appellants are bound by this Court's decision in *Washington Federal* is not only the foundational error that taints its entire order, but it is demonstrably false in light of opt-in class action procedure.

"The law knows few odder parties than the absent class member in a class action lawsuit." 6 Newberg & Rubenstein on Class Actions § 9.1 (6th ed. 2024). "Nonnamed class members . . . may be parties for some purposes and not for others. The label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context." *Devlin v. Scardelletti*, 536 U.S. 1, 10–11 (2002). The *Devlin* court noted that nonnamed class members are "parties in the sense that filing of an action on behalf of the class tolls a statute of limitations against them," but are not considered "parties" for purposes of determining diversity jurisdiction. *Id.* at 10

(citing *American Pipe*, 414 U.S. 538); *see also* 6 Newberg & Rubenstein on Class Actions § 18:14 (6th ed. 2024) ("While a judgment in a class action operates like any other final judgment, given the special nature of the procedural form, there are a variety of class action-specific nuances governing both the definition of the parties who are bound and the scope of what is precluded.").

Rule 23 of the Rules of the Court of Federal Claims ("RCFC") is the same as the Federal Rule of Civil Procedure with one significant difference: the RCFC contemplates only "opt-in" classes. *Compare* RCFC 23, *with* FRCP 23; *and* RCFC Rule 23 Comm. Note; *see Fisher v. United States.*, 69 Fed. Cl. 193, 196 (2006) ("Opt-out classes were viewed as inappropriate in this Court because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers….are more limited than those of a district court."(citing *Berkley v. United States States*, 59 Fed. Cl. 675, 704 (2004))).

The opt-in approach "'resembles permissive joinder in that it requires affirmative action on the part of every potential plaintiff'" to join, and "'unidentified claimants are not bound'" by a ruling in defendant's favor. *Jaynes v. United States*, 69 Fed. Cl. 450, 460 (2006) (quoting *Buchan v. United States*, 27 Fed. Cl. 222, 223 (1992)). Thus,

> [A]n individual who chooses not to opt into a class action in the Court of Federal Claims does not lose any legal rights as a result of that decision. And, nothing that the class representative alleges, argues, wins, or loses

> has any effect on individuals who are not members of the class.

*Gross v. United States*, 106 Fed. Cl. 369, 381 (2012).

Indeed, the preclusive effect of class action proceedings on absent class members only arises ***upon certification*** of the class. *See Smith v. Bayer Corp*., 564 U.S. 299, 315 (2011) ("Neither a proposed class action nor a rejected class action may bind nonparties"); *see also Schwarzschild v. Tse*, 69 F.3d 293, 297 & n.5 (9th Cir. 1995) (citing several circuits as holding "a decision rendered by the district court before a class has been properly certified and notified is not binding upon anyone but the named plaintiffs"); *Faber v. Ciox Health, LLC*, 944 F.3d 593, 602 (6th Cir. 2019) ("When the defendant moves for and obtains summary judgment before the class has been properly notified, . . . the district court's decision binds only the named plaintiffs") (internal quotation marks and citations omitted)); *Wright v. Schock*, 742 F.2d 541, 543–44, (9th Cir. 1984); *Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1382 (D.C. Cir. 1980) (defendants moving for summary judgment before class certification "assume the risk that a judgment in their favor will not protect them from subsequent suits by other potential class members" (internal quotation marks and citation omitted)).[10]

---

[10] Although a limited exception exists, it is inapplicable here given the disparity in the property interests alleged and at stake. *See Taylor v. Sturgell*, 553 U.S. 880 (2008).

Class action judgments do not bar individualized claims of class members, even where they have an identical factual predicate. *See Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 880 (1984); *see also Akootchook v. United States*, 271 F.3d 1160, 1165 (9th Cir. 2001) ("If all class members had to bring their own individual claims in addition to the common class claims, it would destroy the efficiency of having class actions . . . ")

This, of course, is why RCRC Rule 23 provides for subclasses. *See Haggart v. United States*, 104 Fed. Cl. 484, 487–88 (2012); RCFC Rule 23(c)(5). Subclasses may be certified to provide adequate representation to plaintiffs, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999), to distinguish groups of plaintiffs by injury sustained, *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982), or to isolate common issues of law or fact shared by distinct groups of plaintiffs, *Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 111–12 (E.D. Va. 1980).

Subclasses are often created in the CFC to account for different property interests underlying taking claims. *See, e.g.*, *Haggart v. United States*, 108 Fed. Cl. 70, 74 (2012) (rails to trails class divided into six subclasses "based on the nature of the property interests held by plaintiffs"). Thus, had *Washington Federal* survived dismissal, Appellants would almost certainly have comprised a subclass of pre-conservatorship GSE shareholders.[11] Appellants have a distinct property

[11] *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 631 (D.C. Cir. 2017) ("***The***

interest, with distinct investment-backed expectations, from those alleged by the class plaintiffs. But *Washington Federal* never reached the certification stage. So how or when could Appellants have possibly raised their Total Bank Asset taking claims? Appellants cannot be bound by *Washington Federal*.[12]

### E. Appellants' Claims Are Not Barred By Prior Precedent

When Appellants' well-pled factual allegations are properly credited—as they must under *Iqbal*—it is clear that prior precedent is not applicable.

#### 1. *Washington Federal* Involved A Different Property Interest

"*Stare decisis* in essence 'makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience in its decision.'" *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008) (quoting *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570

---

***district court may need to redefine or subdivide the class depending upon what that court determines were the various plaintiffs' reasonable expectations.***") (emphasis added).

[12] Even if this Court applies the "classic" claim preclusion analysis, Appellants' direct taking claim is not barred. In non-class litigation, a party can be collaterally estopped from litigating "an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented." *Simmons v. Small Bus. Admin.*, 475 F.3d 1372, 1374 (Fed. Cir. 2007). "The party asserting issue preclusion bears the burden to establish each of these elements." *Jones v. United States*, 846 F.3d 1343, 1361 (Fed. Cir. 2017). Appellant's direct taking claim is distinct from the claim disposed of by this Court in *Washington Federal*, and there is a fundamental lack of privity between Appellants and the putative class representatives. The Government cannot meet its burden.

(Fed. Cir. 1993)). But ***binding precedent deals only with the law;*** the facts of each case must be determined by the evidence adduced at trial. *Id.* (emphasis added)

Here, the CFC opined that "…enterprise shareholders….do not have a cognizable property interest in their shares of enterprise stock." Appx14.

The CFC looked through the wrong end of the telescope. And, with this blurred vision, either overlooked or ignored the specific facts pled that identify Appellants' private property taken. By so doing, the CFC failed to begin its analysis where all takings analyses must begin: with a recognition and identification of the private property taken by government action.

Unlike Appellants, the class representatives in *Washington Federal* did not allege any independent property interests in assets like those Total Bank Assets taken through government mandated insolvency and receivership.

Glaringly missing from its analysis: *any* consideration of Appellants' allegations regarding their Tier 1 Capital reserves and the Governments' role in regulating them, inducing conversion of them to GSE stock, and the Total Bank Assets directly confiscated. *See, e.g.*, Appx92-97, Appx122-123, Appx130. These allegations simply do not fall within the bounds of *Washington Federal*.

The Government tries to hide behind the *Washington Federal* decision as if it covers the world of potential claims for private property loss resulting from the nationalization of the GSEs. But *Washington Federal* grants no such blanket

immunity from the protections of the Fifth Amendment.

2. Appellants Had Different Investment-Backed Expectations than the *Washington Federal* Class Representatives

The CFC also summarily concluded that *Washington Federal* "held that, given the unique nature of the enterprises and the unusually broad authority the Recovery Act granted the FHFA…enterprise shareholders did not retain 'any investment-backed expectation that the value of their shares would not be diluted and rights otherwise attendant to share ownership would not be temporarily suspended' when the government imposed the conservatorship." Appx14, citing *Wash. Fed.*, 26 F.4th[th] at 1266 (citing *Collins v. Yellen*, 594 U.S. 220 (2021) and *Fairholme*, 26 F.4th 1274).

However, the CFC's categorical disposal of Appellants' investment-backed expectations wrongly conflates what constitutes a "property interest" with the concept of "investment-backed expectations.". *See, e.g.,* Appx11.

"An investment-backed expectation *is not property*. Rather it is a test for determining whether a right to something *is* property." *Ambase*, 58 Fed. Cl. At 51 (emphasis added).

Reasonable, investment-backed expectations are an element of every regulatory takings case. *Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999) (citing *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 Fed. Cir. 1994, *abrogated on other grounds by Bass Enterprises Prod. Co. v. United*

*States*, 381 F.3d 1360, 1369–70 (Fed. Cir. 2004)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984). To the extent there is no *Lucas* "categorical" taking[13], an ad hoc analysis is used to determine whether a regulatory taking occurred, and requires the court to balance: (1) the extent to which the regulation has interfered with reasonable investment-backed expectations; (2) the economic impact of the regulation on the claimant; and (3) the character of the governmental action. *Norman v. United States*, 429 F.3d 1081, 1092–93 (Fed. Cir. 2005) (citing *Penn Cent.*, 438 U.S. at 124).

This analysis requires this Court to examine the facts to determine whether a regulation is simply "adjusting the benefits and burdens of economic life to promote the common good" or instead, whether the regulation "so frustrate[s] distinct investment-backed expectations as to amount to a 'taking.'" *Penn Cent. Transp. Co.*, 438 U.S. at 124, 127 (citing *Pa. Coal Co.*, 260 U.S. 393, 414 (1922)); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, *J.*, concurring) ("Our polestar . . . remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings.")

Assessing the reasonableness of a plaintiff's expectations "is an objective,

[13] While the ad hoc analysis of *Penn Cent. Transp. Co.*, 438 U.S. 104, 124 (1978) generally does not apply where, as here, there was a complete taking, Appellants sufficiently pleaded a regulatory taking under *Penn Central* or, alternatively, under *Lucas*.

but fact-specific inquiry into what, under all the circumstances, the [plaintiff] should have anticipated." *Cienega Gardens v. United States*, 331 F.3d 1319, 1346, 1348–53 (Fed. Cir. 2003) (engaging in extensive analysis of trial record below as to whether "a reasonable developer in the [plaintiff's] circumstances" would have held the same expectations). Such a factual inquiry, of course, cannot be resolved on a motion to dismiss.

Further, a *subjective* factual inquiry is relevant:

> … Model Plaintiffs "would not have entered into the agreements with HUD but for" the benefits in the form of high rents and high market value that they would receive upon prepayment at twenty years and said that it "simply [did] not believe the plaintiffs entered into the HUD program without intending to reap a commensurate economic advantage as of the 20 year prepayment date." The Model Plaintiffs' very participation in the program thus signifies their understanding that their option to exit the housing programs at twenty years would remain in effect. The trial court makes it clear that they would not have participated in the programs otherwise . . . the Owners being indefinitely constrained . . . . The later legislation thus conflicted with the Model Plaintiffs' *investment-backed* expectations.

*Cienega Gardens*, 331 F.3d at1347–48 (internal citations omitted); *compare* Appx96-97.

Timing is paramount. "[T]he timing of the purchase and knowledge of the purchaser are relevant considerations in determining whether a purchaser had

reasonable investment-backed expectations with which the government's regulatory action interfered." *See Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1350 (Fed. Cir. 2020); *cf. Norman*, 429 F.3d at 1092–93 ("it is particularly difficult to establish a reasonable investment-backed expectation" if the property was acquired after the alleged regulatory restriction).

Here, Appellants specifically pled that their investment-backed expectations originated well before HERA:

> FBOP and the FBOP Subsidiaries had reasonable investment-backed expectations that the investments in the GSEs were stable and not subject to a risk of immediate substantial losses capable of leaving the FBOP Subsidiaries undercapitalized. FBOP and the FBOP Subsidiaries had reasonable investment-backed expectations that the United States would not take actions that would destroy the value of the shares that it had previously encouraged the FBOP Subsidiaries to use as Tier 1 Capital.

Appx127.

These pre-HERA investment-backed expectations are distinct from those examined by this Court inother GSE cases, which involved *dramatically different* investments made *after* HERA.

For instance, in *Washington Federal*, having determined that the class representatives could not bring a takings claim based upon the unlawfulness of the conservatorship—a claim not made by Appellants here. This Court noted that, in the context of the share devaluation theory, "that [limited] inquiry requires us to

determine whether, upon lawful imposition of the conservatorships, the shareholders retained any investment-backed expectation that the value of their shares would not be diluted and the rights otherwise attendant to share ownership would not be temporarily suspended. *Collins* makes clear they did not." *Washington Federal*, 26 F.4th at 1266 (internal citation omitted).

But those findings cannot be applied to Appellants' distinct, direct taking claim here. *Collins* did not involve a taking. And there was no assessment made of investment-backed expectations involving Tier 1 Capital invested in the GSEs under regulations in place well before HERA. Rather, the Supreme Court there evaluated whether HERA violated the separation of powers clause. *Collins*, 594 U.S. at 250-51.

In *Fairholme*, post-conservatorship shareholders alleged takings and contract claims arising from FHFA's adoption of the net worth sweep[14] *after* imposition of the conservatorship. *See Fairholme*, 26 F.4th at 1282. *Washington Federal* was purposefully separated from the *Fairholme* appeals by this Court because the claims were "primarily…predicated on the imposition of the conservatorships over the Enterprises, rather than on actions the FHFA later took in its capacity as conservator," i.e., the net worth sweep, which is not at issue here.

[14] The "net worth sweep" refers to an post-conservatorship amendment of the preferred stock purchase agreements. *Id.*

*Washington Federal*, 26 F.4th at 1259.

At bottom, there is a fundamental, case-dispositive difference between the Government acting as a regulator imposing a conservatorship versus the Government's (via FHFA) subsequent conduct as conservator.

Prior GSE cases dealt with shareholders who had purchased stock *after* the enactment of HERA, and *after* the conservatorship was in place. How could those cases have possibly addressed the investment-backed expectations of banks that were induced to invest their critical Tier 1 Capital in the GSEs and then had those reserves taken, with *all of their other property*, due to the Governmental actions? They could not—and did not. That precedent neither governs nor forecloses Appellants' distinct taking claim.

3. Appellants' Engagement in a Highly Regulated Industry Does Not Negate Constitutional Protection

The CFC suggests this Court created a blanket rule that involvement in a "highly regulated" industry is tantamount to forfeiture of constitutional protection. Not so. To the contrary, this Court has emphasized:

> Nor is the fact that the industry is regulated dispositive. A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. But that does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever.

*Cienega Gardens*, 331 F.3d at 1350 (*citing United Nuclear Corp. v. United States*, 912 F.2d 1432, 1436 (Fed. Cir. 1990) (emphasis original) (reversing a holding that a leasehold interest to mine on land did not constitute property for purposes of the Fifth Amendment because mining is a regulated industry).

Moreover,

> [t]his [concept] has often been misconstrued in briefs to the effect that no taking claim may be brought in an area such as banking because the investors should expect "any" regulatory exaction. This is not correct. .The manner in which the concept should be understood is that investment-backed expectations always depend on the ***underlying restrictions at the time of purchase***. . . . Likewise, even in an area regulated as heavily as banking, numerous possible government actions would invoke the Fifth Amendment. ***For example, confiscating a healthy and legally compliant bank to serve as a government bank. Also, confiscating a bank's stock from the bank's owner so that the stock could be given to a failing bank as capital could constitute a taking under the Fifth Amendment.***

*Ambase*, 58 Fed.Cl. at 50–51 (emphasis added); *see also Cienega Gardens*, 331 F.3d at 1344 ("Though *Winstar* was a breach of contract case and not a takings case, it showed that the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking . . ." (citing *United States v. Winstar Corp.*, 518 U.S. 839, 896–97 (1996))

This negates any reliance on *Golden Pacific* for the proposition that Appellants lack a cognizable property interest merely because they were involved

in the banking industry. In *Golden Pacific*, a bank holding company and stockholder in the bank sued the Comptroller of Currency, alleging a taking based on the bank's declaring itself insolvent and its placement in receivership. *Golden Pac. Bancorp. v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994). This Court affirmed a grant of summary judgment, finding that the shareholders lacked investment-backed expectations that the bank could exclude the government from its property when the Comptroller legally imposed receivership on a bank that declared itself insolvent *see Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992).

The Supreme Court has long held that "[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982).

At the time of the imposition of the GSEs conservatorship,, the Government could not legally impose a receivership on the solvent Appellant Banks. Thus, they maintained their bundle of sticks—the Total Banks Assets—and the right to exclude, along with investment-backed expectations that the government would not destroy the value of their mandatory capital reserves dating back to their pre-HERA GSE investment.

///

4. Appellants' Alleged Injury Is Distinct from the GSEs and Prudential Standing Doctrine Does Not Apply

Nor is standing an issue for Appellants once their direct Fifth Amendment claim is appropriately credited. The proper test is a question of Article III standing, i.e., whether Appellants "suffered an 'injury in fact' that is 'fairly traceable" to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 594 U.S. 220, 242 (2021)(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

As discussed, Appellants did not merely "hold shares" in a highly regulated entity. Rather, Appellants had reasonable investment-backed expectations that their investment in the GSE preferred shares was low-risk, was stable (not volatile) and would not be subject to immediate and substantial value loss, particularly at the hand of government action. The Government induced the conversion of Tier 1 Capital to GSE stock, and publicly rated the risk of the investment the same as Treasury Bonds. Therefore, the harm that Appellants[15] suffered as a result of the

[15] Even though *Tooley* does not apply to this case, the direct taking alleged nevertheless, a direct claim under *Tooley*. There, the court stated that "whether a stockholder's claim is derivative or direct . . . must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). The taking of the Total Bank Assets was not harm suffered by the GSEs, who had no ownership interest in Appellants' Total Bank Assets, and the GSEs would receive no benefit if *Appellants* were to obtain just compensation..

taking of their Total Bank Assets through regulatory insolvency is a unique harm not suffered, in any way, by the GSEs. Appellants have Article III standing for their direct taking claim.

### F. Appellants Sufficiently Stated Claims for Breach of Implied Covenant and Implied Regulatory Contract

#### 1. Appellants Plausibly Alleged That a Contract was Formed

The CFC found that Appellants did not plausibly allege the existence of a contract between them and the Government, failing to acknowledge Appellants' allegations that the Government engaged in "[s]omething more . . . that could be consistent with a contract to prove that a contract" existed. *Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1378 (Fed. Cir. 2008) (quotation marks and citation omitted).

Appellants pled that the Government: (1) targeted Appellants with an offer to convert their Tier 1 Capital reserves to capitalize the GSEs; (2) provided incentives to Appellants to accept that offer; and (3), as consideration, , received nearly $900 million of cash from Appellants' Tier 1 Capital in exchange for GSE stock, promising and guaranteeing that the GSE stock would satisfy all regulatory solvency requirements.—all prior to the passage of HERA. Appx92-95.

The Amended Complaint further provided several statements, documents, and actions showing the Government's intent to be bound. See Appx93, Appx95,

Appx96-97, Appx100, Appx118-120.

Thus, Appellants' contract claims rest on much more than "regulatory incentives." Appellants allege with more than "a cloud of evidence," *see id.* at 1378, that the Government guaranteed that the GSE investments were safe investments backed by the Government. Accordingly, Appellants alleged "the role of the [Government] as an independent contracting body" sufficient to withstand a motion to dismiss. *D&N Bank*, 331 F.3d at 1380.

2. <u>Appellants Plausibly Alleged that the Government was a Party to the Contract</u>

Misapplying this court's ruling in *Fairholme*, 26 F.4th at 1274, the CFC erred in concluding that Appellants failed to allege contractual privity.

In *Fairholme*, this Court dismissed a breach of implied contract claim for failure to establish such privity. *See id*. at 1295–96. This Court reasoned that the FHFA did not "retain its governmental character" when succeeding to the enterprises' private contractual agreement with the plaintiff. interpret[] federal law to undertake" the succession to the enterprises' obligations. *Id.* at 1295–96.

Relying on the plaintiff's allegation that the "FHFA assumed the responsibility to act consistently with the [enterprises'] contractual obligations when it became the [enterprises'] conservator," the *Fairholme* panel concluded that the plaintiff's "complaint ma[de] clear that the FHFA's succession to the [e]nterprises' obligations only involve[d] interpreting contractual terms, not federal

law," *Id.* at 1296. and, accordingly, that plaintiff's claim "d[id] not implicate any such governmental activity" that would establish "the requisite privity of contract with the United States." *Id.*

The *Fairholme* claim was not dismissed because it was based on succession to the enterprises' obligations, but because the plaintiff there alleged that the FHFA's succession as conservator, a private actor, "*only* involve[d] interpreting contractual terms, *not* federal law." *Id.* (emphasis added). That is not the case here.

Appellants plausibly alleged that within 24 hours of the imposition of the conservatorship, the FHFA interpreted HERA to transfer its authority and the exclusive right to terminate the conservatorship to the Department of Treasury. Appx111. The FHFA's ability to transfer rights and authority to another governmental agency was not bestowed by the GSEs' pre-conservatorship charters, bylaws, and public disclosures. The FHFA exercised those abilities as a purely governmental function permitted under HERA. Because the GSEs' private charters and bylaws did not provide the scope of the authority of FHFA as a government conservator, "the FHFA [was forced to] interpret HERA" "[i]n deciding what it must do [and] cannot do." *Id.* at 1285 (citations and alteration omitted).

Appellants' allegations substantially differ from the allegations ruled

insufficient in *Fairholme*. Appellants' allegations pled that FHFA was required to interpret the GSEs' contractual terms *and* HERA, contract claims implicate governmental activity by FHFA, satisfying "the requisite privity of contract with the [Government]." *Id.*

## VII. CONCLUSION

For all the reasons discussed herein, Appellants respectfully request that this Court vacate the CFC's dismissal and remand for further proceedings.

Respectfully submitted,

LARSON LLP

/s/ Robert F. Ruyak
Robert F. Ruyak
900 17th Street, N.W., Suite 320
Washington, DC 20006
Tel.: (202) 795-4900
Email: *rruyak@larsonllp.com*

*Counsel for Plaintiff-Appellant*

December 9, 2024

# ADDENDUM

# In the United States Court of Federal Claims

| | |
|---|---|
| MICHAEL E. KELLY, *et al.*,<br>*Plaintiffs,*<br>v.<br>THE UNITED STATES,<br>*Defendant.* | No. 21-1949 L<br>(Filed: May 8, 2024) |

Allan B. Diamond, Houston, TX, for plaintiffs.

Anthony F. Schiavetti, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting the Government's Motion to Dismiss the Amended Complaint**

**SILFEN,** *Judge.*

Michael E. Kelly, along with a bank holding company, nine bank subsidiaries, and one non-bank subsidiary, each of which he controls (collectively "Mr. Kelly"), seeks compensation under the Takings Clause of the Fifth Amendment. Mr. Kelly alleges that the government took his stock interests when two government-sponsored enterprises, Fannie Mae and Freddie Mac, were placed into conservatorships during the 2008 financial crisis. The government moves to dismiss the amended complaint for lack of jurisdiction and for failure to state a claim, arguing that Mr. Kelly's claims are barred by this court's statute of limitations. Mr. Kelly argues that this court has jurisdiction because the Tucker Act's statute of limitations was tolled during a related putative class action, *Washington Federal v. United States*, 149 Fed. Cl. 281 (2020), *aff'd*, 26 F.4th 1253 (Fed. Cir. 2022).

The government further argues that Mr. Kelly's suit is precluded by the Federal Circuit's decision in *Washington Federal*, and Mr. Kelly responds that *Washington Federal* was different enough to not preclude his claims here. But *Washington Federal* has put Mr. Kelly in a bind. He would like his complaint to be similar enough to that in *Washington Federal* to warrant tolling, yet different enough to avoid any preclusion based on the Federal Circuit's decision in that case. That is too fine a line for him to walk. His claims are time barred because the statute of limitations, which is jurisdictional, cannot be tolled. And even if his complaint were timely, it fails to state a claim because *Washington Federal* and other binding Federal Circuit decisions have already

decided the issues in this case. This court therefore **grants** the government's motion and **dismisses** Mr. Kelly's amended complaint.

## I. Background

Congress created the government-sponsored enterprises, Fannie Mae and Freddie Mac, "to provide increased liquidity and stability to the security mortgage market by securitizing mortgage-backed securities." ECF No. 30 at 7-8 [¶¶24-25]; ECF No. 31 at 4.[1] The enterprises purchase mortgages, consolidate them into mortgage-backed securities, and then sell those securities to investors. *Collins v. Yellen*, 141 S. Ct. 1761, 1771 (2021). The enterprises raise funds from the market by issuing stock shares. ECF No. 30 at 8 [¶26]. This process alleviates mortgage lenders' risk of default and makes investors' money available to give out more loans. *Collins*, 141 S. Ct. at 1771. Operating as private, for-profit companies, the enterprises were publicly traded on the New York Stock Exchange until June 2010. ECF No. 30 at 7-8 [¶¶24-25]. But as congressionally chartered institutions, they benefited from the widespread perception that the federal government guaranteed their success and would step in if they experienced any financial hardship. *Washington Federal v. United States*, 26 F.4th 1253, 1260 (Fed. Cir. 2022); *see also* ECF No. 30 at 12 [¶¶38-39].

Given their distinctive status, the enterprises can "purchase more mortgages and mortgage-backed securities at cheaper rates than would otherwise prevail in the private market." *Washington Federal*, 26 F.4th at 1260. One type of share the enterprises issue is preferred stock; preferred stocks have unique rights and benefits that are distinct from and superior to common stocks. ECF No. 30 at 8 [¶27], 30-31 [¶¶98-99]. For example, preferred stock shareholders have a right to receive a portion of the company's assets if the company is dissolved and have priority in receiving dividend payments. *Id.*

In the early 1980s, Mr. Kelly acquired and became president and CEO of First Bank of Oak Park (FBOP). ECF No. 30 at 6 [¶18]. The bank grew to become a large multi-bank holding company with nine subsidiaries. *Id.* at 6-7 [¶20]. By the early 2000s, FBOP was the largest privately held bank holding company in the country. *Id.* at 7 [¶20]. The bank and its subsidiaries collectively owned $19.4 billion in assets. *Id.*

In 2006, the Office of Federal Housing Enterprise Oversight, the enterprises' chief regulator, increased the enterprises' capital requirements, forcing the enterprises to issue additional preferred stocks. ECF No. 30 at 9 [¶32]. The government therefore added strong incentives for banks to invest in the enterprises. *Id.* at 9-10 [¶¶33-34]. Banks were permitted to invest up to 100% of their tier one capital in the enterprises' preferred shares. *Id.* at 10 [¶36]. Tier one capital is a bank's core capital, the "minimum adequate funds determined to be needed by a bank to function on a regular basis." *Id.* at 10-11 [¶36]. This was a significant change; typically, a bank could invest at most 10% of its tier one capital in those types of shares. *Id.* at 10-11 [¶¶36-37].

[1] For purposes of this motion, the court accepts the allegations in Mr. Kelly's complaint as true. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

In late 2007 and early 2008, Mr. Kelly bought the enterprises' preferred stocks, enough to give him a total of approximately $898 million in those preferred stocks. ECF No. 30 at 14 [¶46]. That investment was a substantial percentage of Mr. Kelly's tier one capital. *Id.* at 17 [¶50].

### A. The 2008 financial crisis and the conservatorships

As the financial crisis loomed, Congress enacted the Housing and Economic Recovery Act, 12 U.S.C. §§ 4501-4642. ECF No. 30 at 20 [¶61]. The statute created the Federal Housing Finance Agency (FHFA) and gave it both supervisory and regulatory authority over the enterprises. 12 U.S.C. § 4511. Congress gave the FHFA discretion to appoint itself as conservator or receiver over the enterprises and specified the ways in which it could do that. 12 U.S.C. § 4617(a)(1)-(a)(3). The statute also included a judicial review provision for the enterprises to challenge the creation of a conservatorship or receivership in district court. *Id.* at (a)(5).

When the housing bubble burst, the enterprises suffered a massive loss. *See Collins*, 141 S. Ct. at 1771. On September 6, 2008, the FHFA exercised its authority under the Recovery Act and placed the enterprises into conservatorships. ECF No. 30 at 20 [¶63]. The board of directors for each enterprise consented to the conservatorship. *Washington Federal*, 149 Fed. Cl. at 287; *see also* ECF No. 30 at 22-23 [¶¶69-70] (asserting that the government "directed" the boards to consent, and otherwise the government "would seize them").

The next day, the FHFA entered into senior preferred stock purchase agreements with the Treasury Department to help keep the enterprises afloat. ECF No. 30 at 28 [¶89]. Under the agreements, Treasury agreed to invest billions of dollars for one billion dollars' worth of senior preferred shares in the enterprises. *Id.* Under the agreements, the FHFA gave Treasury exclusive control over the conservatorships. *Id.* at 28 [¶90].

The day after that, the value of the enterprises' preferred shares nosedived. ECF No. 30 at 31 [¶101]. Like countless others who had invested a large percentage of their tier one capital in the enterprises' preferred shares, Mr. Kelly lost substantial stock value. *Id.* at 31 [¶101] (FBOP lost $885 million); *id.* at 35 [¶114] (Mr. Kelly's tier one capital shares diminished by more than 98%). For Mr. Kelly this meant that seven of the nine FBOP subsidiaries had insufficient tier one capital to meet regulatory requirements, so the government placed them into receiverships. ECF No. 30 at 35 [¶114], 39 [¶127]. The remaining two subsidiaries were also put in receiverships under the government's cross-guaranty authority. *Id.* at 39 [¶128]. By the end of 2008, FBOP became insolvent and was forced to liquidate its assets. *Id.* at 40 [¶132]. Ultimately Mr. Kelly alleges that he lost $19.4 billion in combined assets, nearly his entire net worth. *Id.* at 42 [¶¶136-37].

### B. *Washington Federal*

On June 10, 2013, some enterprise shareholders filed a putative class-action lawsuit, on behalf of themselves and others similarly situated, alleging that "the United States has expropriated all of their economic interests in Fannie and Freddie stock, along with any other property rights they had in their stock" by taking the enterprises into conservatorships and entering into agreements to purchase the enterprises' preferred stock. *Washington Federal*, 149 Fed. Cl. at 288. The plaintiffs asserted that the conservatorships constituted a Fifth Amendment taking or, in the alternative, an illegal exaction of their property interests in their stock holdings. *Id.* at 288-89.

This court ultimately dismissed *Washington Federal*, holding that the plaintiffs lacked standing to allege direct takings claims (149 Fed. Cl. at 292-97), and on February 22, 2022, the Federal Circuit affirmed (26 F.4th at 1270). Although the *Washington Federal* plaintiffs pleaded their claims as direct takings, the Federal Circuit agreed with this court's determination that the claims were in fact substantially derivative in nature, and that the plaintiffs lacked standing to litigate those third-party claims as direct claims. 26 F.4th at 1267-68; *see* 149 Fed. Cl. at 292, 294.

The Federal Circuit explained that, under the "so-called shareholder standing rule," injured shareholders may not bring a direct action to enforce the rights of the corporation; only the corporation may bring such a claim. *Washington Federal*, 26 F.4th at 1267. The plaintiffs' allegation that the government violated their shareholder rights "depend[s] on an alleged injury to the Enterprises." *Id.* at 1268; *see also id.* at 1269; 149 Fed. Cl at 294-95. As third parties, the *Washington Federal* plaintiffs did not have standing under the "prudential standing" doctrine and could not bring a direct takings claim. *Id.* at 1267-70; *see* 149 Fed. Cl at 294-95. They had at most a derivative action. *Id.*

The Federal Circuit further explained that shareholders, like the *Washington Federal* plaintiffs, may bring derivative actions, but only in the "extreme circumstances" that the enterprises' management "refuse[s] to pursue an action enforcing the Enterprises' rights for reasons other than good-faith business judgment," or that there is a conflict of interest between the managers and the shareholders. *Washington Federal*, 26 F.4th at 1267-68; *see* 149 Fed. Cl at 296-97. The *Washington Federal* plaintiffs demonstrated neither circumstance. *Washington Federal*, 26 F.4th at 1267-68; *see* 149 Fed. Cl at 296-97. Thus, the plaintiffs also failed to establish standing to bring their derivative claim. *Washington Federal*, 26 F.4th at 1268.

The Federal Circuit also agreed with this court in rejecting the plaintiffs' arguments that the claims were analogous to the direct breach-of-contract claim at issue in *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) (*Perry II*), for which shareholders had standing. *Washington Federal*, 26 F.4th at 1266, 1268-69; *see* 149 Fed. Cl. at 295-96. Although the *Washington Federal* and *Perry II* claims arose from the same 2008 events and concerned similar agreements, the shareholders in *Perry II* sought to enforce the parties' own shareholder contracts and sued their contracting partners—the enterprises—not the conservators. 26 F.4th at 1268-69; *see also* 149 Fed. Cl. at 296. The shareholders' claims in *Perry II* could not plausibly belong to the enterprises, whereas the *Washington Federal* plaintiffs had tried to "enforce the legal rights and interests of the Enterprises." 26 F.4th at 1269. The two cases were not analogous. *Id.* at 1268.

Finally, the Federal Circuit gave an additional rationale not addressed by this court. The *Washington Federal* plaintiffs' takings question had already been settled: Previous, binding cases had already established that enterprise shareholders "cannot assert a cognizable takings claim regarding actions taken in connection with the imposition of the conservatorships in 2008." *Washington Federal*, 26 F.4th at 1265-66. According to the Court, enterprise shareholders do not retain the same degree of property interests in their shares as shareholders of other companies because Congress granted the FHFA unusually broad authority to act as conservator of the enterprises and to act against shareholders' best interests. *Id.* at 1266. Given the exceptional status of the enterprises, enterprise shareholders had no investment-backed expectation that the value of their shares

would not be diluted or used for the public's benefit. *Id.* Because the *Washington Federal* plaintiffs could not establish that, as shareholders, they held property interests, they could not establish a taking. *Id.*

### C. This action

On October 1, 2021, while the *Washington Federal* appeal was pending, Mr. Kelly filed his complaint in this court. ECF No. 1. Like the *Washington Federal* plaintiffs, Mr. Kelly alleged that the FHFA's conservatorships over the enterprises amounted to a taking or illegal exaction of his financial property. *Id.* at 1 [¶1], 40 [¶B]. Mr. Kelly also alleged that the establishment of the conservatorships constituted a breach of a contract between himself and the government. *Id.* at 1 [¶1], 41 [¶C].

This court stayed Mr. Kelly's action pending a final decision in *Washington Federal*. ECF No. 8. Following the Federal Circuit's decision, the court lifted the stay, and Mr. Kelly filed an amended complaint. ECF No. 30. The amended complaint omits the illegal exaction claim and allegations related to the illegality of the conservatorships, adds facts related to the contract claim, and is designed to better establish Mr. Kelly's standing. ECF No. 25 at 6; *compare* ECF No. 1 *with* ECF No. 30. The government then moved to dismiss the amended complaint. ECF No. 31.[2]

## II. Discussion

Mr. Kelly seeks compensation for an alleged Fifth Amendment taking of his stock assets and shareholder property rights. ECF No. 30 at 43-57, 67. He also asserts that the government took his right to seek meaningful judicial review. *Id.* at 52 [¶168]. He asserts both direct and derivative takings claims. *Id*. at 4 [¶12]. He also requests damages for an alleged breach of the covenant of good faith and fair dealing and an alleged breach of an implied contract. *Id.* at 58-67. The government moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. ECF No. 31; *see* RCFC 12(b)(1), 12(b)(6).

On a motion to dismiss for lack of jurisdiction under this court's rule 12(b)(1), the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If the court determines that it lacks subject-matter jurisdiction, it must dismiss the action. RCFC 12(b)(1), (h)(3); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). A "plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Tucker Act provides the court with "jurisdiction to render judgment upon any claim against the United States founded … upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

---

[2] The case was originally assigned to Judge Davis and was transferred to me soon after the government filed its motion to dismiss.

The Takings Clause of the Fifth Amendment of the Constitution provides that "private property [shall not] be taken for public use, without just compensation." A takings claim "is founded upon the Constitution and [is] within the jurisdiction of the Court of [Federal] Claims to hear and determine." *Knick v. Township of Scott*, 588 U.S. 180, 190 (2019) (quotation marks omitted).

A statute of limitations restricts this court's jurisdiction. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008) (maintaining the Supreme Court's longtime interpretation that this court's statute of limitations is "jurisdictional"). "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. For a Fifth Amendment taking, the claim accrues at the time of the taking. *Knick*, 588 U.S. at 190.

On a motion to dismiss for failure to state a claim under rule 12(b)(6), the court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Lindsay*, 295 F.3d at 1257. The court is not required to accept the parties' legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy, or do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). A complaint fails to state a claim when every claim, or an issue essential to judgment on each claim, has already been determined by a final judgment in a prior case. *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

### A. Mr. Kelly's complaint is barred because *Washington Federal* cannot toll the statute of limitations

The parties do not dispute, for purposes of this motion, that Mr. Kelly's takings claims accrued on September 6, 2008, when the government placed the enterprises into conservatorships. ECF No. 30 at 20 [¶63]; ECF No. 31 at 13-14; ECF No. 33 at 14 & n.3, 22. Under the Tucker Act's statute of limitations, Mr. Kelly had six years, until September 6, 2014, to bring suit. *See* 28 U.S.C. § 2501. Mr. Kelly filed this suit on October 1, 2021, thirteen years after his claims accrued.

Mr. Kelly asserts that his complaint is timely because the limitations period was tolled while *Washington Federal* was pending; he was a putative member of the class of plaintiffs in that case; and thus he reasonably thought he could have his claims resolved there. *Washington Federal* was filed on June 10, 2013—within Mr. Kelly's limitations period—and was dismissed on July 16, 2020. ECF No. 30 at 4. With tolling, he had until October 3, 2021, to file this suit. He filed this suit two days before that deadline. ECF No. 33 at 22.

The government argues that Mr. Kelly's claims cannot be tolled by *Washington Federal*. ECF No. 31 at 13-17. The government asserts that the Supreme Court has clearly established that (1) class-action tolling is equitable in nature; and (2) equity cannot toll the Tucker Act's statute of limitations. *Id.*; ECF No. 40 at 2-7. According to the government, class-action tolling is thus not available, and this court lacks subject-matter jurisdiction over Mr. Kelly's complaint. *Id.*

The government is correct: The Tucker Act's statute of limitations is not subject to class-action tolling. Mr. Kelly's complaint was not tolled by *Washington Federal* and is time barred.

The Supreme Court first recognized class-action tolling in *American Pipe* in 1974. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). The Court held that a timely-filed class-action lawsuit can toll the limitations period for each putative class member's individual claims. The Court reasoned that putative class members are only "passive beneficiaries" of the action until the class is certified. *Id.* at 551-52. Before that, putative class members cannot fully evaluate their own interests. *Id.* And the federal class-action rule, rule 23, was "not designed to afford class action representation only to those who are active participants in or even aware of the proceedings" before a class certification decision. *Id.* at 552. To give meaning and effect to the federal class-action rule, and to preserve putative members' interests, the Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," from the date of filing until the day the court finds the suit inappropriate for class status. *Id.* at 554; *see id.* at 552-53. When class certification is denied, the statute-of-limitations clock begins to run again for the individual members of the failed class. Each person then has the remaining days under the limitations period to intervene as an individual plaintiff in the action. *Id.* at 561.

Almost a decade later, the Supreme Court extended the tolling rule to potential class members who bring separate individual lawsuits rather than intervening in the original action. *Crown, Cork & Steel Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983). To preserve the spirit and objectives of the tolling rule, the Court held that *American Pipe* must also protect those who choose to file their own suits instead of intervening. *Id.* at 350-354. "There are many reasons why a class member, after the denial of class certification, might prefer to bring an individual suit rather than intervene," and a court could deny intervention "for reasons wholly unrelated to the merits." *Id.* at 350. The Court therefore held that a putative class member may also promptly bring an individual lawsuit after the denial of class certification, even where that claim would otherwise be untimely filed. *Id.* That is the type of case Mr. Kelly tried to file.

Here, the parties disagree over whether *American Pipe* tolling—as extended by *Crown, Cork & Steel*—is statutory or equitable in nature and thus whether it is available to toll actions brought in this court. If statutory, yes. If equitable, no.

The Federal Circuit previously applied *American Pipe* tolling to the Tucker Act's statute of limitations, 28 U.S.C. § 2501. In *Bright v. United States*, 603 F.3d 1273, 1274 (Fed. Cir. 2010), the Federal Circuit permitted the existence of a class action to toll section 2501, holding that "when a class action complaint is filed in the Court of Federal Claims and class certification is sought prior to expiration of the section 2501 limitations period, the limitations period is tolled … during the period the court allows potential class members to opt in to the class."

The government asserts, however, that the Supreme Court's decision in *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497 (2017) (*CalPERS*) has effectively overruled *Bright.* ECF No. 31 at 14-17; ECF No. 40 at 3-7. According to the government, *Bright* relied on the premise that *American Pipe* tolling was statutory and acknowledged that section 2501 is not subject to equitable tolling. ECF No. 31 at 16; ECF No. 40 at 5. In the government's view, *CalPERS* later resolved that *American Pipe* tolling is in fact equitable. ECF No. 31 at 16-17. Because this court cannot alter the limitations period for equitable considerations, the government argues that no equitable tolling is available. *Id.*; ECF No. 40 at 7.

Mr. Kelly responds that *Bright* remains good law in spite of the *CalPERS* decision. ECF No. 33 at 15-17. He criticizes the government for disregarding *Bright's* "nuanced reasoning" and for creating a "bright-line rule prohibiting class action tolling … on *any* Tucker Act claim." *Id.* at 14, 16. Mr. Kelly argues that *American Pipe* tolling is a one-of-a-kind, neither statutory nor equitable, "common law device designed to effectuate Rule 23." *Id.* at 16-17, 17 n.5. Mr. Kelly distinguishes *CalPERS* because it did not examine class-action tolling in the context of this court, its jurisdiction, and its rules.

Essential to *Bright's* analysis is the presumption that *American Pipe* tolling is a statutory rule. *Bright*, 603 F.3d at 1279-80, 1287-88. The Federal Circuit explained that *American Pipe* tolling is "not based on judge-made equitable tolling, but rather on the Court's interpretation of [Federal Rule of Civil Procedure] 23." *Id.* at 1279 (quotation marks omitted). "Having determined that Rule 23 tolling is statutory rather than equitable," the Court explained, "it follows that the rule of *American Pipe* applies to the government just as it does to private parties." *Id.* The opinion was careful to differentiate between statutory tolling and equitable tolling, clarifying that it was addressing only "whether section 2501's limitations period is *non-equitably tolled* [that is, statutorily tolled] for putative members under RCFC 23." *Id.* at 1287 (emphasis added). In contrast, the Federal Circuit reaffirmed that under *John R. Sand & Gravel*, "equitable tolling is barred under section 2501." *Id.* at 1287.

Mr. Kelly is therefore correct that *Bright* distinguished the two forms of tolling—equitable and statutory—but he is incorrect that *Bright* characterized class-action tolling as distinct from either category. Instead, *Bright* held that *American Pipe* tolling is statutory, and its reasoning hinges on that categorization. *Bright*, 603 F.3d at 1285-88. Because the Federal Circuit understood *American Pipe* tolling to be statutory, and not equitable, it held that a class action could toll section 2501. *Id.* at 1287-88.

But now the Supreme Court has held that *American Pipe* tolling is equitable, not statutory. *CalPERS*, 582 U.S. at 509-510. "[T]he source of the tolling rules applied in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions." *Id.* *CalPERS* thus undermines *Bright's* logical premise. This court cannot toll the Tucker Act's statute of limitations for a class action.[3]

Earlier Supreme Court decisions, including *American Pipe* itself, were ambiguous on the statutory-versus-equitable question. *See CalPERS*, 582 U.S. at 510; *see also American Pipe*, 414

---

[3] This court "may not disregard its reviewing court's precedent," such as *Bright*. *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005). But there is a narrow exception, when that "precedent is expressly overruled … by a subsequent Supreme Court decision." *Id.* The Federal Circuit follows the same rule when deciding whether a panel must follow an earlier panel decision. *Texas Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995). If the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," "[i]t is established that a later panel can recognize that the court's earlier decision has been implicitly overruled as inconsistent with intervening Supreme Court authority." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (quotation marks omitted). The same must be true for a trial court looking at Federal Circuit and Supreme Court authority that interact in the same way.

U.S. at 558 (referring to the class-action tolling rule as arising from "judicial power," which sounds more equitable than statutory, but not elaborating). But in *CalPERS*, the Supreme Court was clear: "Nothing in the *American Pipe* opinion suggests that the tolling rule it created was mandated by the text of statute or federal rule. Nor could it have." 582 U.S. at 509. *American Pipe* tolling, the Court clarified, is firmly "grounded in the traditional equitable powers of the judiciary." *Id* at 508-10. *American Pipe's* "reasoning … reveals a rule based on traditional equitable powers, designed to modify a statutory time bar where its rigid application would create injustice." *Id.* at 510. Because *American Pipe* tolling is equitable, the Court concluded that it could not toll the time-bar statute at issue in *CalPERS* because "the text, purpose, structure, and history of [that] statute all disclose the congressional purpose to offer defendants full and final security" after a set number of years. 582 U.S. at 510-11.

Since *CalPERS*, the Supreme Court has reaffirmed its understanding that *American Pipe* tolling is an equitable rule. *See China Agritech, Inc. v. Resh*, 584 U.S. 732, 743, 745 (2018). Although the Federal Circuit has not had occasion to address the issue after *CalPERS*, other courts of appeals have followed the Supreme Court's reasoning. *See, e.g.*, *Testa v. Becker*, 910 F.3d 677, 683-84 (2d Cir. 2018); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 609 (3d Cir. 2018); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 854 Fed. App'x 570, 572 (5th Cir. 2021) (unpublished); *Potter v. Comm'r of Soc. Sec.*, 9 F.4th 369, 371 (6th Cir. 2021); *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 742 (7th Cir. 2018).

Mr. Kelly attempts to limit the *CalPERS* holding to statutes of repose, which are more absolute than statutes of limitations. ECF No. 33 at 17. He is correct that *CalPERS* addressed a statute of repose (582 U.S. at 516) and that a statute of repose is more absolute, displacing "the traditional power of courts to modify statutory time limits in the name of equity" (*id.* at 510, 516). And consistent "with the different purposes embodied in statutes of limitations and statutes of repose," statutes of limitations are generally more amenable to equitable tolling than statutes of repose. *Id.* at 511-12. Complicating the matter, "Congress has used the term 'statute of limitations' when enacting statutes of repose" and vice versa. *CTS Corp. v. Waldburger*, 573 U.S. 1, 13 (2014).

To determine whether a tolling rule applies, the Supreme Court looks not at the label but instead at the statute's "text, purpose, structure, and history" (*CalPERS*, 582 U.S. at 510-11), and whether the statute is "fundamentally incompatible" with the principles of equitable tolling (*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991)). Tolling is impermissible where Congress has indicated that the statutory period is an absolute bar. *CalPERS*, 582 U.S. at 507-508; *see also CTS Corp.*, 573 U.S. at 8-9; *Lampf*, 501 U.S. at 363 (overruled in part by statute); *Weddel v. Sec'y of Health and Hum. Servs.*, 100 F.3d 929, 931-32 (Fed. Cir. 1996).

The Supreme Court in *CalPERS* reviewed the terms, structure, and legislative history of the time bar at issue there and determined it to be an absolute time bar, thus classifying it as a statute of repose. 582 U.S. at 505-06. The Court then held the purpose of that statute to be incompatible with tolling principles. *Id.* at 510.

While there are distinctions between statutes of limitations and statutes of repose, section 2501 is an unusual type of statute of limitations. As the Supreme Court held in *John R. Sand & Gravel*, it has long been established that section 2501 is "more absolute" than the typical statute of limitations. 552 U.S. at 133-36. Often referred to as a "jurisdictional" statute, section 2501

requires this "court to decide a timeliness question despite a waiver" and forbids it from considering "whether certain equitable considerations warrant extending a limitations period." *Id.* at 133-34; *see FloorPro, Inc. v. United States*, 680 F.3d 1377, 1382 (Fed. Cir. 2012). It is "not susceptible to equitable tolling." *John R. Sand & Gravel*, 552 U.S. at 136.

In contrast to the typical statute of limitations, the primary goal of jurisdictional statutes is not to ensure the timeliness of claims. *John R. Sand & Gravel*, 552 U.S. at 133. Instead, these statutes are designed "to achieve a broader system-related goal, such as facilitating the administration of claims" and "limiting the scope of a governmental waiver of sovereign immunity." *Id.* at 133; *see generally United States v. Wong*, 575 U.S. 402, 408-09 (2015).

In essence, then, section 2501 is more akin to a statute of repose than a statute of limitations. *See Hart v. United States*, 910 F.2d 815, 817-19 (Fed. Cir. 1990) (categorizing the section 2501 "as a statute of repose" and holding that because it is "jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity," it "may not be waived," and courts "are not free to engraft exceptions" onto it). Like the statute of repose examined in *CalPERS*, section 2501 is thus an absolute bar that "supersedes the application of a tolling rule based in equity." *CalPERS*, 582 U.S. at 510.

It has long been settled that equitable considerations may not extend the statute of limitations for this court. *John R. Sand & Gravel*, 552 U.S. at 133-34. *Bright* affirms that holding, reiterating that "equitable tolling is barred under section 2501." 603 F.3d at 1287. *Bright* was mistaken only as to the nature of *American Pipe* tolling. Now that the Supreme Court has resolved that *American Pipe* tolling is equitable, *Bright*, were it decided today*,* would have to come out the opposite way.

Mr. Kelly distinguishes *CalPERS* for examining the tolling question in the context of an opt-out, rather than opt-in, class action. ECF No. 33 at 16-17. He is correct that the rules of this court permit only opt-in class actions. *See Bright*, 603 F.3d at 1277 & n.1. Parties in other cases have argued a similar distinction, but neither *Bright* nor *CalPERS* distinguishes opt-in from opt-out class actions for purposes of whether class-action tolling applies to section 2501. *Bright*, 603 F.3d at 1284-85; *see generally CalPERS*, 582 U.S. at 512. The distinction is irrelevant here.

Finally, Mr. Kelly raises this court's 2022 decision in *Birdbear v. United States*, 162 Fed. Cl. 225 (2022), in which the court applied *American Pipe* tolling rule to section 2501. ECF No. 33 at 15. *Birdbear* does not undermine the court's conclusion today. The parties in *Birdbear* did not argue that *Bright* might have been overruled (*see Birdbear v. United States*, No. 16-75L, ECF No. 187 at 3, 35 and ECF No. 191 at 12-13), and *Birdbear* does not cite *CalPERS*, instead relying only on *American Pipe* and *Bright.* 162 Fed. Cl. at 242. The decision does not provide any guidance on how to reconcile *Bright* and *CalPERS*. Regardless, prior decisions of the Court of Federal Claims, "while persuasive, do not set binding precedent for separate and distinct cases." *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994).

In sum, the Supreme Court's holding in *CalPERS* undermines *Bright*. *American Pipe* tolling is equitable, not statutory, and equitable considerations cannot alter the statute of limitations

in section 2501. Thus, *American Pipe* tolling is unavailable to Mr. Kelly here. Because the statute of limitations has not been tolled, Mr. Kelly's complaint is time barred.[4]

### B. Even if Mr. Kelly's complaint were timely, it fails to state a claim

Even if it were timely, Mr. Kelly's complaint must alternatively be dismissed because it fails to state a claim on which relief may be granted for any of its five counts. *See* RCFC 12(b)(6). As a matter of law, as a shareholder, Mr. Kelly is precluded from bringing either the direct or derivative takings claims he asserts. In *Washington Federal*, the Federal Circuit already determined that nearly identical claims, brought by the same type of plaintiff, arising from the same transactional facts, failed on the merits. Even if Mr. Kelly's takings claims were not barred under the formal claim- and issue-preclusion doctrines, the same issues have already been decided in a Federal Circuit decision that is binding on this court. Mr. Kelly also fails to establish the existence of an implied covenant or implied contract with the government.

#### 1. Claim preclusion bars Mr. Kelly's takings claims

The government argues that, were this court to have jurisdiction over Mr. Kelly's claims, claim preclusion bars his takings claims. ECF No. 31 at 3-4; ECF No. 40 at 12-19; ECF No. 47 at 28:10-19 (hearing transcript, stating that both claim and issue preclusion apply to various aspects of Mr. Kelly's case but that claim preclusion bars the takings claims). According to the government, Mr. Kelly's case is substantially identical to *Washington Federal*: Both concern the same parties, enterprise shareholders; both arise from the same transactional set of facts, the government imposing conservatorships; and both allege that imposing the conservatorships diminished their stock value. ECF No. 31 at 29-31.

Mr. Kelly responds that his "is a very different case with very different claims," arising from different sets of transactional facts, than *Washington Federal*. ECF No. 33 at 4, 22-42. According to Mr. Kelly, his takings claims concern a compensable property interest: "the investment-backed expectations of banks that were induced to invest their critical Tier 1 Capital Reserves in the [enterprises] and then lost those reserves" (ECF No. 33 at 25) "when the conservatorship was imposed" (*id.* at 38). According to Mr. Kelly, *Washington Federal* concerned only the reduced stock value resulting from the government imposing the same conservatorships. *Id.* at 24. He also argues that *Washington Federal* relied on the idea that the government acted unlawfully when it imposed the conservatorships, whereas his claims are "agnostic" on the lawfulness of that conduct. *Id.* at 22-24; *see also* ECF No. 47 at 60:9-61:20. Finally, he argues that *Washington Federal* does not preclude his derivative takings claims because the plaintiffs in that case alleged only direct, not derivative, takings claims. ECF No. 33 at 39.

---

[4] Because the court holds, as a general matter, that *American Pipe* tolling cannot be applied to section 2501, this decision need not address two of the government's alternative arguments. ECF No. 31 at 17-23; ECF No. 40 at 7-12. The court need not address whether tolling would otherwise be prohibited because the plaintiffs in *Washington Federal* never moved to certify the class within the statutory window, a question that *Bright* left open (603 F.3d at 1290 n.9). And the court need not separately address whether Mr. Kelly's breach-of-implied-covenant and breach-of-implied-contract claims could be tolled by *Washington Federal*.

Mr. Kelly's takings claims are precluded by *Washington Federal*. Under the doctrine of claim preclusion, a final judgment on the merits "forecloses successive litigation of the very same claim" by the same party or its privies, "whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire*, 532 U.S. at 748 (quotation marks omitted). To be precluded, the later claim must arise from the same set of transactional facts as the first, such that the later claim could have and should have already been litigated. *Bowers Inv. Co., LLC v. United States*, 695 F.3d 1380, 1384 (Fed. Cir. 2012). The *Washington Federal* decision and Mr. Kelly's takings claims concern the same set of transactional facts and involve the same parties.

Whether two claims involve the same transactional facts is determined "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Phillips/May Corp. v. United States,* 524 F.3d 1264, 1271 (Fed. Cir. 2008) (quoting Restatement (Second) of Judgments § 24(2) (1982)).

Mr. Kelly's takings claims, like those in *Washington Federal*, arise from the government's placing the enterprises into conservatorships and are based on his status as an enterprise stock shareholder. *Compare* ECF No. 30 at 2 [¶¶5-6] *with Washington Federal*, 26 F.4th at 1260-61, 1265. The plaintiffs in *Washington Federal* alleged that, by imposing the conservatorships during the 2008 financial crisis, the government destroyed the value of their enterprise stock shares and nullified the rights and benefits of those shares, which amounted to a taking. *Washington Federal*, 26 F.4th at 1260-62, 1265. Mr. Kelly likewise alleges that when the government put the enterprises into conservatorships during the 2008 financial crisis, the government "took for a public use the rights, protections, and duties that adhered to the ownership of the [enterprises'] preferred shares," drastically devaluing shareholders' investments, which amounted to a taking. ECF No. 30 at 2 [¶¶5-6], 34 [¶101]. Both are traceable to the FHFA's imposing the conservatorships under the authority of the Recovery Act in 2008. *Compare Washington Federal*, 26 F.4th at 1262 *with* ECF No. 30 at 34 [¶101], 52 [¶171].

The court is unpersuaded by Mr. Kelly's distinction between *Washington Federal*—which alleged that the FHFA's conduct was unlawful—and his amended claims—which are "agnostic" on that lawfulness. *See* ECF No. 33 at 22-24. Although the *Washington Federal* plaintiffs alleged unlawfulness, the Federal Circuit analyzed the takings claims as if the government's imposing the conservatorships had been lawful (26 F.4th at 1266) because a valid takings claim requires that the taking "be premised upon a government action that is either expressly or impliedly authorized by a valid enactment of Congress" (*Dureiko v. United States*, 209 F.3d 1345, 1359 (Fed. Cir. 2000)). Because "an uncompensated taking and an unlawful agency action constitute separate wrongs that give rise to separate causes of action," the *Washington Federal* plaintiffs could only litigate their takings claims "on the assumption that the FHFA's appointment as conservator was lawful." 26 F.4th at 1263-64, 1266. The court therefore determined only "whether, upon lawful imposition of the conservatorships, the shareholders retained any investment-backed expectation that the value of their shares would not be diluted and the rights otherwise attendant to share ownership would not be temporarily suspended." *Id.* at 1266.

Mr. Kelly's distinction between direct and derivative takings claims is also immaterial for claim-preclusion purposes. *See* ECF No. 33 at 39. Claim identity is not required for preclusion to apply; the claims need only concern the same operative facts. *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011); *Johns-Manville Corp. v. United States*, 855 F.2d 1556, 1567 (Fed. Cir. 1988). Irrespective of the label, the takings claims in *Washington Federal* "rest[ed] on the expropriation of the Washington Federal Plaintiffs' economic interests and property rights as shareholders." 26 F.4th at 1262. Same with Mr. Kelly's takings claims. ECF No. 30 at 41 [¶135], 47-48 [¶152], 55 [¶154]; ECF No. 33 at 37. Mr. Kelly presents a different theory based on the same facts. ECF No. 33 at 36-39*; see generally* ECF No. 30. But the "bar to subsequent litigation applies 'even though the plaintiff is prepared in the second action to present evidence or grounds or theories of the case not presented in the first action.' Different legal theories do not create separate claims for res judicata purposes even though 'the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.'" *Resource Investments, Inc. v. United States*, 785 F.3d 660, 667 (Fed. Cir. 2015) (cleaned up, quoting Restatement (2d) of Judgments § 25, § 24 cmt. c (1982)); *see id.* at 664-668.

Regardless, *Washington Federal* addresses derivative claims. The *Washington Federal* plaintiffs called their takings claims "direct." 26 F.4th at 1267. But the Federal Circuit reasoned that the so-called "direct" claims were substantively derivative because the "alleged injuries [were] not independent of alleged harms to the Enterprises," as the shareholders' injury of diminution in share value "flowed from the injury to the Enterprises" when the government established the conservatorships. *Id.* at 1268; *see also id.* at 1269. The Court then analyzed the takings claims as derivative claims, and its holding—that enterprise shareholders lack a cognizable property interest in enterprise stock and lack standing to bring derivative shareholder actions on behalf of the enterprises (*id.*at 1265-70)—is a judgment on the merits regarding derivative taking claims. *See id.* at 1267-68.

Regarding the same-party analysis, although Mr. Kelly was not a named plaintiff in *Washington Federal*, he was in privity with the *Washington Federal* plaintiffs for claim-preclusion purposes.

In shareholder derivative class actions and putative class actions like *Washington Federal*, courts treat nonparty shareholders of the same corporation, and the corporation itself, as in privity for claim-preclusion purposes. Restatement (Second) of Judgments § 59(2) (1982) ("The judgment in an action to which the corporation is a party is binding under the rules of res judicata [or claim preclusion] in a subsequent action by its stockholders or members suing derivatively in behalf of the corporation, and the judgment in a derivative action by its stockholders or members is binding on the corporation."); *Cottrell v. Duke*, 737 F.3d 1238, 1243 (8th Cir. 2013) ("Under Delaware law, a judgment rendered in a shareholder-derivative lawsuit will preclude subsequent litigation by the corporation and its shareholders."); *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981) ("parties and their privies include the corporation and all nonparty shareholders"); *Stella v. Kaiser*, 218 F.2d 64, 65, 68 (2d Cir. 1954). Because a derivative claim brought by a shareholder belongs not to that shareholder, but to the corporation, the corporation "is the real party in interest" and "is bound by the result of the suit." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970). The corporation and any shareholders wishing to bring a later derivative action are bound by the judgment "even if

different shareholders prosecute the suits," as long as the first shareholder "fairly and adequately represent[s] the corporation." *In re Sonus Networks, Inc, Shareholder Derivative Litig.*, 499 F.3d 47, 64 (1st Cir. 2007). Thus, the real parties in interest in both this case and *Washington Federal* are the enterprises.

To avoid claim preclusion, Mr. Kelly argues that community banks that placed their tier one capital in the enterprises, like his, were not represented in *Washington Federal*. ECF No. 33 at 38. But for purposes of his tolling argument, Mr. Kelly argued that he qualified as a putative class member in that same action. *Id.* at 14 (asserting that the *Washington Federal* class action tolled "a putative plaintiff's," meaning his, "individual claims"); *see also id.* at 11 (noting that the proposed classes in *Washington Federal* "included pre-conservatorship shareholders of both common and preferred stock of the" enterprises). It is hard to imagine a scenario in which Mr. Kelly could simultaneously be a putative class member to benefit from tolling and distinct enough from that putative class to avoid preclusion.

### 2. Binding precedent holds that Mr. Kelly fails to state a takings claim

Even if formal claim preclusion did not bar Mr. Kelly's takings claims, the binding *Washington Federal* precedent would still require dismissing his case. To plead a taking, Mr. Kelly must establish (1) that he held a legally cognizable property interest at the time of the taking, and (2) that the government's actions amounted to a compensable taking of that property interest. *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). Mr. Kelly cannot establish either element. First, *Washington Federal* held that enterprise shareholders, such as Mr. Kelly, do not have a cognizable property interest in their shares of enterprise stock. 26 F.4th at 1266. Second, *Washington Federal* also held that the government's imposing the conservatorships in 2008 did not amount to a taking. *Id.* Beyond those two defects, the Federal Circuit held that enterprise shareholders, like Mr. Kelly, lack standing under the prudential standing doctrine to bring takings claims. *Id.* 1267-70.

On the first prong, the Federal Circuit has established that enterprise shareholders do not have cognizable investment-backed expectations and property rights under the Recovery Act. In *Washington Federal*, the Federal Circuit held that, given the unique nature of the enterprises and the unusually broad authority the Recovery Act granted the FHFA over the enterprises, enterprise shareholders did not retain "any investment-backed expectation that the value of their shares would not be diluted and rights otherwise attendant to share ownership would not be temporarily suspended" when the government imposed the conservatorship. *Washington Federal*, 26 F.4th at 1266 (citing *Collins*, 141 S. Ct. 1761 and *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022)). "Under [the Recovery Act], the FHFA may act in ways that are *not* in the best interests of the Enterprises or the shareholders, and, instead, are beneficial to the [agency] and the public it serves." *Id.* "Where shareholders hold shares in such highly regulated entities—entities that the government has the authority to place into conservatorship—where the conservator's powers are extremely broad, and where the entities were lawfully placed into such a conservatorship," the Court reasoned, "shareholders lack a cognizable property interest in the context of a takings claim." *Id.* at 1266; *see id.* at 1266 n.9. The same goes for Mr. Kelly. As a shareholder of the same highly regulated enterprises, Mr. Kelly does not have investment-backed expectations or property rights in the value of his shares in the enterprises.

On the second prong, the *Washington Federal* plaintiffs could not show that the government's actions could amount to a taking. 26 F.4th at 1266 & n.9. As the Court explained, shareholders cannot allege takings "regarding actions taken in connection with the imposition of the conservatorships in 2008." *Id.* at 1266. Likewise for Mr. Kelly; given the government's statutorily mandated authority, even if its actions were not in the best interests of the enterprises or its shareholders, the government's actions cannot amount to a taking.

In addition, as in *Washington Federal*, Mr. Kelly is not in a position to bring his takings claims under the prudential standing doctrine. The "prudential standing rule … normally bars litigants from asserting the rights or legal interests of others in order to obtain relied from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975). Under the related shareholder standing rule, shareholders injured as a result of their ownership in a corporation generally lack standing to bring a direct action enforcing the rights of the corporation; only the corporation has a direct interest to enforce its own rights. *Washington Federal*, 26 F.4th at 1267 (relying on *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990), and *Starr Int'l Co. v. United States*, 856 F.3d 953, 966 (Fed. Cir. 2017)). If a shareholder has suffered a harm independent of the harm to the corporation, he has distinct personal rights and may assert a direct claim, even if the corporation's rights are also implicated. *Id.* at 1267-70; *cf. Franchise Tax Bd.*, 493 U.S. at 336-37 (determining that the plaintiffs' claims fell within this exception, where they alleged injuries independent of their status as shareholders). But "when the alleged harm to the corporation and alleged harm to the shareholder are not independent, the claim is only substantively derivative in nature." *Washington Federal*, 26 F.4th at 1269.

Mr. Kelly's allegedly direct takings claims are substantively identical to the allegedly direct takings claims in *Washington Federal*, which the Federal Circuit held to be derivative. *See supra* part II.B.1. Mr. Kelly alleges that the stock price of his investments in the enterprises "plummeted" as a direct result of the "nationalization" of the enterprises through the government's imposing the conservatorship. ECF No. 30 at 2 [¶6]. So too did the *Washington Federal* plaintiffs. 26 F.4th at 1268 (plaintiffs alleged, "as a result of the Government's … imposition of the conservatorships" the value of their shares to "plummet[ed], … destroying all shareholder rights and property interests" and constituting a taking). Like the *Washington Federal* plaintiffs, whose injury "flowed from the injury to the Enterprises" when the government established the conservatorships (26 F.4th at 1268), Mr. Kelly alleges that his injury was the "direct result" of the government imposing the enterprise conservatorships (ECF No. 30). Those takings claims must be asserted derivatively. *Washington Federal*, 26 F.4th at 1267-68. Only the enterprises may litigate the enterprises' harms, even if a shareholder like Mr. Kelly suffers a secondary harm resulting from the same government actions. *Id.* at 1267-70. Mr. Kelly thus lacks standing under the prudential standing doctrine to assert his allegedly direct takings claims.

Mr. Kelly also cannot, under the shareholder standing rule, assert any of his derivative takings claims. A shareholder may bring a derivative action only when the corporation refuses to enforce its own rights for reasons other than good-faith business judgment. *Washington Federal*, 26 F.4th at 1268; *Ross*, 396 U.S. at 534. Mr. Kelly does not allege that the enterprises used other than good-faith business judgment in declining to enforce their own rights. *See generally* ECF No. 30. Like the *Washington Federal* plaintiffs, Mr. Kelly lacks standing under the prudential standing doctrine to assert his derivative takings claims.

There is a limited conflict-of-interest exception to the rule about derivative claims. *First Hartford Corp.*, 194 F.3d at 1295 (holding that where "a government contractor with a putative claim of breach by a federal agency was being operated by that very same federal agency," there was a conflict of interest that warranted shareholder standing to bring a derivative action). But here, as the D.C. Circuit has explained, the Recovery Act's succession clause (12 U.S.C. § 4617(b)(2)(A)(i)) does not allow for a conflict-of-interest exception. *Perry II*, 864 F.3d at 623-28; *accord Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397, 409-410 (7th Cir. 2018). While the Federal Circuit has not supplied any precedent on the conflict-of-interest exception in this situation, it briefly discussed the issue in *Fairholme Funds*, 26 F.4th at 1302-03 & n. 13. There, this court had relied on the conflict-of-interest exception. The Federal Circuit reversed on other grounds. But the Federal Circuit distinguished *Collins* and *Perry II*, on one hand, from *First Hartford*, on the other, noting that under both *Collins* and *Perry II*, the Recovery Act requires the government to consider the best interests of only the FHFA and the enterprises, not enterprise shareholders. The statute at issue in *First Hartford*, on the other hand, permitted the government to consider depositors' interests in conservatorship judgments. Given that distinction, it makes sense that, as the D.C. Circuit held, there is no conflict-of-interest exception for claims under the Recovery Act.[5]

### 3. Mr. Kelly fails to state a claim for breach of an implied covenant or implied contract

Mr. Kelly also has not established that he had implied contracts with the government, so his complaint does not state a claim for breach of covenant or breach of implied regulatory contract.

To show that there was an implied-in-fact contract, Mr. Kelly must provide facts that clearly indicate (1) a mutual intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) in an alleged contract involving the government, a government representative whose conduct is relied upon who has actual authority to bind the government in contract. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Implied contracts, "founded upon a meeting of minds," require conduct "showing, in the light of the surrounding circumstances, [the

---

[5] Congress created a specific review process for challenging the FHFA's conduct in imposing the conservatorships. *Washington Federal*, 26 F.4th at 1265-66. The Recovery Act gave the enterprises the authority to seek review in a district court within 30 days. 12 U.S.C. § 4617(a)(5). The Recovery Act governs the conservatorships that Mr. Kelly opposes. A party generally cannot circumvent a congressionally prescribed review process to challenge the government's unlawful conduct by bringing a takings claim in this court. *See generally Washington Federal*, 26 F.4th at 1265-66. It may be that, even apart from his standing to sue, Mr. Kelly cannot circumvent the statutorily prescribed review scheme through a suit in this court. *See Pregis Corp. v. Kappos*, 700 F.3d 1348, 1358-59 (Fed. Cir. 2012) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of certain persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded," and allowing collateral attacks would "destroy the [statute's] careful framework for judicial review at the behest of particular persons through particular procedures." (quotation marks omitted)).

parties'] tacit understanding." *Baltimore & O.R. Co. v. United States*, 261 U.S. 592, 597 (1923). There is a particularly high bar to establish implied regulatory contracts with the government because the legislature's principal function "is not to make contracts, but to make laws that establish the policy of the state." *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 630 (Fed. Cir. 2012). Thus, there is a strong presumption against finding a contract absent clear legislative intent that the government wishes to bind itself. *Id.* An "agency's performance of its regulatory or sovereign functions does not create contractual obligations." *Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1378 (Fed. Cir. 2008).

Mr. Kelly argues that government incentives induced him to invest his tier one capital in the enterprises and that the government promised that those investments were secured and guaranteed by the government, amounting to an implied contract between him and the government. ECF No. 33 at 42-49; ECF No. 47 at 61:23-63:25. He also argues that an implied contract exists based on the enterprises' bylaws and shareholders' investments. ECF No. 30 at 58 [¶195]; ECF No. 33 at 42-46. The government became a party to this contract, he argues, when the FHFA took on the role as conservator, stepping into the shoes of the enterprise. ECF No. 30 at 58 [¶195]; ECF No. 33 at 42-49.

Regulatory incentives encouraging shareholders like Mr. Kelly to buy enterprise stock, and government statements that shareholders' investments were safe, do not amount to contractual promises. Instead, they are the government acting as regulator. *Mola Dev. Corp.*, 516 F.3d at 1378. Those statements embody government policies designed to encourage investment in the enterprises "to support and accomplish the recapitalization goals of the [enterprises] under the 2006 Consent Agreements." ECF No. 30 at 9 [¶33]. Nothing shows a government intent to contract, an offer and acceptance, or any commitment to compensating shareholders if investment values decline. In fact, the Recovery Act disclaims any guarantees for shareholders' investments in the enterprises. 12 U.S.C. § 4501(4) ("[N]either the enterprises … nor any securities or obligations issued by the enterprises … are backed by the full faith and credit of the United States."); 12 U.S.C. § 4503 ("This chapter may not be construed as implying that any such enterprise … or any obligations or securities of such an enterprise … are backed by the full faith and credit of the United States."). Mr. Kelly's allegations do not establish an implied contract with the government.

Even if there were a contract, "[a]s a general rule, for purposes of Tucker Act jurisdiction, the government consents to be sued only by those with whom it has privity of contract." *Fairholme Funds*, 26 F.4th at 1294. The government is correct that Mr. Kelly cannot show that the government is a party to any contract with him, as required. In *Fairholme Funds*, an enterprise shareholder argued that, when the FHFA imposed the conservatorships, the agency became a party to the contractual rights and obligations derived from enterprise stock certificates. 26 F.4th at 1294-95. Rejecting that theory, the Federal Circuit reasoned that, when the FHFA acted as a conservator, it was not engaged in government activity and thus lost its federal character. *Id.* at 1294-96. The FHFA therefore could not be held to be a party to that contract and could not be sued for breach of contract. *Id.* at 1295-96; *see Perry II*, 864 F.3d 591.

Mr. Kelly's theory is nearly identical to that of the *Fairholme Funds* plaintiffs. He argues that by imposing the conservatorship, the government took over the enterprises' rights and obligations, making the government a party to the contract. ECF No. 30 at 2-3 [¶7], 58-59 [¶¶195-97]. Like those plaintiffs, Mr. Kelly cannot establish that the government is a party to the alleged

contract he seeks to enforce because the FHFA was not acting in its governmental capacity when it took over the enterprises' rights and obligations via the conservatorships.

In sum, Mr. Kelly fails to allege the facts necessary to assert his implied covenant or breach-of-contract claims against the government arising from the government imposing the conservatorships in 2008.

## III. Conclusion

This court **grants** the government's motion to dismiss and **dismisses** Mr. Kelly's amended complaint. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Molly R. Silfen
MOLLY R. SILFEN
Judge

# In the United States Court of Federal Claims

**No. 21-1949 L**
**Filed: May 8, 2024**

************************************
**MICHAEL E. KELLY, *et al.*,** *
**Plaintiffs,** *
*
**v.** *
*
**THE UNITED STATES,** *
**Defendant.** *
************************************

**JUDGMENT**

Pursuant to the court's Opinion and Order, filed May 8, 2024, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs' complaint is dismissed.

Lisa L. Reyes,
Clerk of Court

By: s/ Ashley Reams
Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Effective December 1, 2023, the appeals fee is $605.00.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2042

**Short Case Caption:** Kelly v. U.S.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,855 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 12/09/2024

Signature: /s/ Robert F. Ruyak

Name: Robert F. Ruyak