**2024-2042**

# United States Court of Appeals for the Federal Circuit

MICHAEL E. KELLY, FBOP CORP., RIVER CAPITAL ADVISORS, INC., PARK NATIONAL BANK, SAN DIEGO NATIONAL BANK, PACIFIC NATIONAL BANK, BANKUSA, NORTH HOUSTON BANK, MADISON STATE BANK, COMMUNITY BANK OF LEMONT, CITIZENS NATIONAL BANK, CALIFORNIA NATIONAL BANK,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

*On Appeal from the United States Court of Federal Claims in No. 1:21-cv-01949-MRS, Honorable Molly R. Silfen, Judge*

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

ALAN DIAMOND
DIAMOND MCCARTHY LLP
909 Fannin Street, Suite 3700
Houston, Texas 77010
(713) 333-5100
allan.diamond@diamondmccarthy.com

ROBERT F. RUYAK
LARSON LLP
900 17th Street, NW, Suite 320
Washington, DC 20006
(202) 795-4900
rruyak@larsonllp.com

DANA M. HOWARD
LARSON LLP
555 South Flower Street, 30th Floor
Los Angeles, California 90071
(213) 436-4888
dhoward@larsonllp.com

*Counsel for Plaintiffs-Appellants*

MARCH 14, 2025

COUNSEL PRESS (800) 4-APPEAL • (331248)

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 7

A. Appellants' Claims Were Tolled by Putative Class Action .......... 7

1. Section 2501 Is Not Jurisdictional Because It Fails the Clear-Statement Test, Which This Court Must Apply after *Harrow* .......... 7

2. *Bright* Remains Good Law .......... 12

3. *American Pipe* Tolled This Case .......... 14

B. Appellants Have Pled a Sufficient Constitutional Takings Claim .......... 15

1. Appellants' Allegations Related to Tier 1 Capital Regulatory Scheme Pre-Dating HERA Must be Credited .......... 16

2. *Washington Federal* Does Not Control Where Appellants' Property Interests and Their Investment-Backed Expectations are Distinguishable .......... 18

3. Properly Applying Federal Circuit Precedent Makes Clear That The Motion to Dismiss was Improperly Granted .......... 24

C. Appellants Have Stated A Valid Claim for Breach of Implied Contract .......... 27

III. CONCLUSION .......... 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anaheim Gardens, L.P. v. United States*,
953 F.3d 1344 (Fed. Cir. 2020) ....................23, 24

*Bowles v. Russel*,
551 U.S. 205 (2007).................... 9

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006)....................8

*Armstrong v. United States*,
364 U.S. 40 (1960)....................26

*Calder v. Bull*,
3 Dall. 386 (1798) ....................26

*Cienega Gardens v. U.S.*,
331 F.3d 1319 (Fed. Cir. 2003) ....................23, 24, 25, 28

*Cienega Gardens v. U.S.*,
503 F.3d 1266 (Fed. Cir. 2007) ....................*passim*

*Collins v. Village of Palatine, Ill.*,
875 F.3d 839 (7th Cir. 2017) ....................15

*Crown, Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983)....................29

*D & N Bank v. United States*,
331 F.3d 1374 (Fed. Cir. 2003) ....................28

*Fifth Third Bank of Western Ohio v. United States*,
402 F.3d 1221 (Fed. Cir. 2005) ....................28

*Gardens v. United States*,
174 Fed.Cl. 700 (2025)....................23

*Geneva Rock Products, Inc. v. United States*,
100 Fed. Cl. 778 (2011)....................14

*Harrow v. Dep't of Def.*,
601 U.S. 480 (2024)....................7, 8, 9, 12

*Henke v. United States*,
60 F.3d 795 (Fed. Cir. 1995)....................16

*John R. Sand & Gravel Co v. United States*,
552 U.S. 130 (2008)....................*passim*

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................26

*Mendenhall v. Cedarapids, Inc.*,
5 F.3d 1557 (Fed. Cir. 1993)....................19

*MOAC Mall Holdings LLC v. Transform Holdco LLC*,
598 U.S. 288 (2023)....................14

*Mola Dev. Corp. v. United States*,
516 F.3d 1370 (Fed. Cir. 2008)....................28

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022)....................8, 12

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)....................21

*Penn. Central Transportation Co. v. New York City*,
438 U.S. 104 (1978)....................2, 4, 5, 26

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002)....................21

*United States v. Lippitt*,
100 U.S. 663 (1880)....................10

*United States v. Wong*,
575 U.S. 402 (2015)....................9, 10

*Washington Federal v. United States*,
26 F.4th 1253 (Fed. Cir. 2022)....................*passim*

*Winstar Corp. v. United States*,
64 F.3d 1531 (Fed. Cir. 1995), ....................................................................28, 29

**Federal Statutes**

Emergency Low-Income Housing Preservation Act of 1987..................................22

Low-Income Housing Preservation and Resident Homeownership Act .................22

**Other Authorities**

Fifth Amendment ...........................................................................1, 22, 24, 26

## I. INTRODUCTION

The Government's response—rife with the same legal arguments and factual mischaracterizations proffered in and adopted by the Court of Federal Claims below—does nothing to change the fact that Appellants have pled a valid Fifth Amendment claim sufficient to survive a motion to dismiss.

Indeed, short of resorting, time and again, to its perpetual refrain, i.e., "This is the same as *Washington Federal*," the Government largely fails to grapple with the multiple reasons why the trial court erred in granting the Government's deficient motion, by ignoring:

- Appellants' unique property interest allegations, which distinguish their property claim from that addressed in *Washington Federal v. United States*, 26 F.4th 1253 (Fed. Cir. 2022);
- The procedural predicate that a pre-class certification dismissal permits subsequent individualized claims of absent class members who have differing property interests to pursue them;
- The dramatic difference in the alleged "investment-backed expectations" of Appellant banks due to the possessory interest in their regulatory mandated capital and other assets—a factually-intensive inquiry unbefitting resolution on a motion to dismiss; and
- The allegations of the impact of the Government's pre-HERA conduct

and regulations recommending, endorsing, and promoting Appellants' investment of Tier 1 Capital in the GSEs, for the public benefit and as satisfaction of the Government's regulatory capital requirements, upon Appellants' expectations that the value of those unique assets would not later be destroyed by government action.

The fundamental error lies in the failure of the trial court to consider—let alone accept as true—Appellants' clear allegations that distinguish the claims reviewed by the Court in *Washington Federal*. This fundamental error violates the very principles governing a motion to dismiss, which this Court has long recognized, and which guarantee a plaintiff's right to have its claims fairly heard rather than peremptorily dismissed.

It is likewise fundamental that each constitutional takings claim under the Bill of Rights must be evaluated independently on its own terms, taking into consideration all of its attendant factual allegations. *See, e.g., Penn. Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Enforcement of this constitutional right, along with the right to due process, can require nothing less.

That this case may be a rare procedural and factual outlier is no reason for its dismissal. Appellants' taking claim—based not merely on a reduction in share value, but in the taking of hundreds of millions of dollars of bank assets—may be *sui generis*, but so, too, were the unprecedented pre-HERA regulations authorizing

and promoting such an arrangement and the subsequent 2008 financial crisis. In other words, this may be new territory, but well-established takings precedent has already built the bridge to get there. *Washington Federal* does not foreclose Appellants' ability to cross it.

Furthermore, while the actions taken by the federal government were squarely in the public interest—nationalizing the GSEs to stabilize the fragile U.S. mortgage market, the collapse of which would be catastrophic to millions of Americans—the character, scope, and dimension of Appellants' private bank assets taken by such action, as specifically pled in the complaint, was markedly different from the property alleged by the general putative class of GSE shareholders in *Washington Federal.*

And, given this foundational distinction, the "reasonable investment-backed expectations" of Appellants were diametrically different based upon the continuous, direct, co-dependent relationship between the Government and Appellant banks, as pled with supported evidence. These community bank Appellants had the "reasonable investment-backed expectation" that the government would do nothing to destroy the value of their highly-regulated Tier 1 Capital, the substance and composition of which the government regulators—and not the banks—had ultimate control. These same government regulators, too, mandated that maintaining value of the bank's Tier 1 Capital was essential to the

banks' continued solvent existence. Yet the regulators intentionally promoted the GSE investments—to serve as a significant or total component of Tier 1 Capital—as essentially "risk-free," all for the government's singular, self-directed, public interest purpose and intent of funding the GSEs long before the financial crisis of 2008 reared its head.

The Government's response—and the trial court's below—conveniently ignores this vital piece of the puzzle. Were Appellants shareholders in the GSEs and part of the broadly defined putative *Washington Federal* class (thus entitled to tolling?)—yes. For Appellants, the governmental action in question is not simply the imposition of the conservatorship. It is the GSE's nationalization via conservatorship and the government's much earlier significant regulatory change, accompanied by encouragement, and financial incentives (codified by statute nonetheless) to convert up to 100% of their existing, secure Tier 1 Capital to investments in the GSEs. HERA was subsequently passed well after, and with the knowledge that, Appellants had already acceded to the Governments wishes, and their Tier 1 Capital had been converted to GSE investments predating any indication that HERA would even be necessary.

These facts radically change the nuanced, ad hoc inquiry into whether Appellants can ultimately satisfy the *Penn Central* factors to demonstrate a compensable taking—an inquiry that simply cannot be resolved on a motion to

dismiss. This has been made clear by this Court's consistent precedent in, among others, the Preservation Statute cases. *See* Section II(B)(2), *infra*. At a minimum, Appellants have stated a viable claim under *Penn Central* and its progeny and are entitled to pursue it.

Simply put, the crux of the dispute, now narrowed by the Government's briefing on appeal, is whether Appellants' claim is the same as that pled in the complaint filed by the putative class representatives and dismissed by this Court in *Washington Federal*. The answer is indisputably "no."

There, this Court disallowed a taking claim rooted in a diminution of share value. But it did not, and could not, categorically foreclose any or all potential takings claims predicated on the Government's decision to nationalize the GSEs. And it did not address how the confiscation of Appellants' Tier 1 Capital together with all other bank assets unrelated to the GSE investments—unique to Appellants and not pled by the putative class representatives, because they could not do so—fundamentally alters the conclusions reached in *Washington Federal*. Had that class action proceeded, the claims court may have created a subclass that specifically addressed Appellants' distinct property claims. But the action never got that far.

Finally, from a jurisdictional standpoint, Appellants' claims are timely. Appellants can benefit from *American Pipe* tolling while at the same time avoiding

preclusion. As spelled out in Appellants' opening brief, the Supreme Court now commands that all statutes of limitation—except for the one at issue in its *Bowles* decision—pass the clear-statement test before being construed as a jurisdictional time bar. Neither the Supreme Court nor this Court have tested Section 2501 under the clear-statement test that the Supreme Court has developed. To do so requires analyzing Section 2501's text and statutory context. When considering Section 2501 under the entire clear-statement test, Congress has not provided a clear statement that Section 2501 imposes a jurisdictional time bar. For that reason alone, *American Pipe* tolling remains available to Appellants.

If this Court declines the Supreme Court's command to consider Section 2501 under the clear-statement test, this Court's decision in *Bright* nonetheless remains good law. The Supreme Court's treatment of *American Pipe* tolling as an inapplicable tolling rule in *CalPERS* does not abrogate *Bright* because *CalPERS* involved a statute of repose, not a statute of limitations like Section 2501. In addition, *American Pipe* tolling is not a tolling rule barred under the Supreme Court's *John R. Sand* analysis or foreclosed under *CalPERS*. In short, the Supreme Court's decision in *John R. Sand* that the Government cannot waive the period of limitations in Section 2501 does not take *American Pipe* tolling off the table—as if it were a statute of repose.

If this Court concludes that Section 2501 fails the clear-statement test or that

*Bright* remains good law, then *American Pipe* tolling applies in light of the procedural posture of the case for the reasons discussed in Appellants' opening brief and for which the Government does not even address with any counterargument. The Government's reference back to the Court's treatment of the issue below by way of a footnote provides an insufficient basis to find and hold for the Government on this point.

This Court must insist that its precedent be consistently applied to this case—both procedurally, in properly addressing a motion to dismiss by accepting, rather than ignoring, Appellants' well-pled claims; and substantively, by applying the proper legal framework for determining the validity of Appellants' constitutional taking claims. When doing so, the trial court's dismissal with prejudice must be reversed and remanded.

## II. ARGUMENT

### A. Appellants' Claims Were Tolled by Putative Class Action

#### 1. Section 2501 Is Not Jurisdictional Because It Fails the Clear-Statement Test, Which This Court Must Apply after *Harrow*

The Government talks around Appellants' central argument that this Court must now subject Section 2501 to the clear-statement test before treating it as a jurisdictional time bar. *See Harrow v. Dep't of Def.*, 601 U.S. 480, 482, 484, 488–89 (2024). In *Harrow*, the Supreme Court in no uncertain terms and for the first

time stated that all time bars, except for the time bar discussed in *Bowles*, must pass the clear-statement test: "**As to all other time bars, we now demand a "clear statement."** *Id.* at 488–89. The clear-statement test that *Harrow* now demands be applied to all other time bars before a Court can treat the time bar as jurisdictional requires that **Congress** – not the Courts – provide the clear statement that it is so. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642–43 (2022) (stating that the "text of a law controls over purported legislative intentions unmoored from any statutory text," and the court "may not replace the actual text with speculation as to Congress's intent").

In *Arbaugh* – the origin of the clear-statement test – the Court saw a need for a "readily administrable bright line" rule for determining when a statutory limitation affects jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2006). To fill that need, the Court decided that if "**the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional**, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character." *Id.* (internal citations and footnotes omitted).

The Government suggests – or asks this Court to infer – that Section 2501 passes the clear-statement test because *John R. Sand* cites *Arbaugh*. *See John R.*

*Sand & Gravel Co v. United States*, 552 U.S. 130, 133 (2008) That, however, is not the case. *Bowles* – the one valid exception to the clear-statement test according to *Harrow* – also cited *Arbaugh*. *Bowles v. Russel*, 551 U.S. 205, 213 (2007). The Supreme Court itself, in *Wong*, has explained that Section 2501 did not pass the clear-statement test because its ruling was based on *stare decisis* alone:

> The Tucker Act's bar was different because it had been the subject of a "a definitive earlier interpretation." And for that reason alone, *John R. Sand* left in place our prior construction of the Tucker Act's time limit. **What is special about the Tucker Act's deadline, *John R. Sand* recognized, comes merely from this Court's prior rulings, not from Congress's choice of wording**.

*See United States v. Wong*, 575 U.S. 402, 416–17 (2015) (internal citations omitted). Because the Supreme Court has never tested the jurisdictional nature of Section 2501 under the clear-statement test, this Court must do so in the first instance.

As explained in Appellants' opening brief, Section 2501 does not pass the clear-statement test because the language of the statute does not provide a clear statement, the statutory context of Section 2501 suggests that Congress did not intend it to be jurisdictional, and the cases construing Section 2501 and its historical analogue do not make it a clear statement as to its jurisdictional nature. The Government does not address Appellants' thorough analysis on these points.

For example, as for the text, the Supreme Court itself recognized that the words Congress used did not make Section 2501 jurisdictional. *See Wong*, 575

U.S. at 416–17 ("What we have done is to say, again and again, that the core language in that provision has no jurisdictional significance.").

As for statutory context, Section 2501's limitations period was codified far afield from the grant of jurisdiction to the CFC, which the Supreme Court treats as evidence that a limitations period should not be treated as jurisdictional. Because Congress granted the CFC power to hear claims in a part, chapter, and section far afield from the filing deadline, statutory context does not make Section 2501 a clear statement from Congress that an untimely filing is jurisdiction stripping. *Wong*, 575 U.S. at 411 ("This Court has often explained that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." (multiple citations omitted)).

Finally, as described in the opening brief, Supreme Court precedent does not clarify the issue because, for example, Justice Harlan created an equitable exception to the historical analog of Section 2501 in *United States v. Lippitt*, 100 U.S. 663, 669 (1880). In that case, petitioner's claim was presented to a department of the government instead of the court within the relevant time period but to the court outside the relevant time period. The Supreme Court found the claim timely nonetheless out of a sense of fairness and justice:

> It is conceded by the government that the claim was presented at the proper department, and, when presented, was not barred by the limitation of six years. But the contention of the Attorney-General is that the Court of

> Claims is prohibited by the express words of the statute from giving judgment against the government upon *any* claim which is not asserted by petition filed therein within six years after the claim first accrued, or which is not within that period transmitted to the court from one of the Houses of Congress or by the head of an executive department.
>
> We are unable to concur in this construction of the statute of March 3, 1863. Such a construction would work an injustice which we cannot suppose Congress intended should be done to the citizen having a demand against the government.

*Id.* at 666–67. The Supreme Court in *Sand* identified *Lippett* as reserving the application of the time bar's application in some circumstances. *Sand*, 552 U.S. at 134–35 (citing *Lippett*, 100 U.S. at 669). In another case cited in *Sand*, the Supreme Court cited *Lippett* for its tolling principle. *See Sand*, 552 U.S. at 135 (citing *United States v. New York*, 160 U.S. 598, 616–19 (1886)). Appellants' opening brief then goes through painstaking detail on how changes to the statute after these historical cases support Appellants' position.

The Government contends with none of these arguments or their nuances. Instead, the Government claims on its own *ipse dixit* that Section 2501 passes the clear statement test. The Government, however, relies on pre-*Harrow* decisions describing and citing *John R. Sand* for the proposition that the Court should not revisit a prior holding that treats a statute as jurisdictional. But *Harrow* clearly changes that calculus because never has the Supreme Court demanded that **"all . . .**

**time bars"** pass the clear-statement test. The "Court does not give 'dispositive weight to the expectations that the enacting Congress had formed in light of the contemporary legal context' because [it] 'begin[s] (and [can] end) our search for Congress's intent with . . . text and structure.'" *Castro-Huerta*, 597 U.S. at 643 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287–88 (2001)). Appellants are not asking that this Court revisit *Sand* or deem *Sand* overruled – the Supreme Court itself is now commanding this Court to apply the clear-statement test to Section 2501. And – as Appellants point out – in carving out *Bowles* from the clear-statement test, *Harrow* did not cite *Sand*, recognize a *Sand* exception along with a *Bowles* exception, or describe the *Bowles* exception as one that could capture *Sand*'s holding notwithstanding the fact that the Government cited *Sand* in its *Harrow* briefing.

Based on the foregoing, the Government has not provided this Court with a good reason to ignore *Harrow*'s holding that all time bars except for the one discussed in *Bowles* must now pass the clear-statement test. For all the reasons discussed in-depth in Appellants' opening brief, Section 2501 does not pass the clear-statement test.

2. *Bright* Remains Good Law

Should the Court decide against applying the clear-statement test to Section 2501 in this case, *Bright* remains good law notwithstanding *CalPERS*'s gloss on

*American Pipe* tolling.

As an initial matter, *Sand*'s characterization that Section 2501 was not subject to "certain equitable considerations" invokes the traditional sense of equity in which the Court considers whether plaintiff was pursuing his rights diligently and some extraordinary circumstance stood in his way to a timely filing. *American Pipe*, however, espouses a tolling rule that was not founded on these traditional equitable notions. Because of that, *Sand* does not preclude *American Pipe* tolling. *Sand* held only that Section 2501 was like the "more absolute" deadlines because, as had been held in prior cases, the Government could not waive it. 552 U.S. at 133–34. *Sand* did not hold that all equitable considerations were off the table, nor could it. As explained above, *Sand* itself cited Supreme Court cases in which some equities were considered and in which the Supreme Court held open the possibility that some equities might favor a tolling rule. *Compare Lippett*, 100 U.S. 668 ("We are satisfied that the delay was accidental, certainly not with any intention to defraud or injure the claimant. If the plea had, upon its face, admitted, or if the fact was established by competent evidence, that the delay in deciding, or in referring the claim to the Court of Claims, was intentional, or with a purpose to defeat the claimant, by limitation, the court would certainly not permit the government to profit by such a course."), *with MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 298 (2023) ("But not even such egregious conduct by a litigant

would permit the application of judicial estoppel as against a jurisdictional rule.”).

Second, *CalPERS* was a case that involved a statute of repose, not a statute of limitations. Because a statute of repose necessarily works to create an absolute bar on a defendant’s temporal liability – which a statute of limitations does not do - *CalPERS* does not abrogate *Bright*. There is no basis to graft the treatment of *American Pipe* tolling to a statute of repose onto a statute of limitations. Unlike a statute of repose, statutes of limitations are – as a default – considered next to the equities. In short, *CalPERS*’s gloss on *American Pipe* tolling is inapplicable to a statute of repose and does not command this Court to abandon *Bright*.

3. *American Pipe* Tolled This Case

Finally—either because it fails the clear-statement test or under this Court’s *Bright* ruling—*American Pipe* tolls Section 2501’s limitations period in this case. As explained in Appellants’ opening brief, the procedural posture of this case operates such that *American Pipe* tolls the statute of limitations if it remains applicable to Section 2501. *See Geneva Rock Products, Inc. v. United States*, 100 Fed. Cl. 778 (2011) (noting that *Bright* applied when the plaintiff actually informed the court (and defendant) that it sought class certification by filing a properly-worded complaint and that “*Bright*’s tolling . . . was contingent not on a motion for class certification, but rather on plaintiff’s seeking class certification which may be done through class-action allegations in the complaint.”); *accord*

*Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 840–41 (7th Cir. 2017). The Government refers this Court to the trial court's treatment of this issue in a footnote in its response brief. *See* Resp. Br. 26, n.4. The Court should consider the Government's arguments on this point waived. If this Court finds that Section 2501 remains subject to *American Pipe* tolling, this Court should then find that *American Pipe* tolled Section 2501 in this case.

### B. <u>Appellants Have Pled a Sufficient Constitutional Takings Claim</u>

With respect to the merits, Appellants can, and have, stated a legally sufficient takings claim related to the Government's actions that nationalized the GSEs and confiscated all their bank assets. Starting from the misplaced foregone conclusion that *Washington Federal* governs, the Government overlooks the relevant authority, conflates the requisite elements beyond recognition, and in the end, resorts to an improper, overly broad application of *Washington Federal* to circumvent Appellants' legally sufficient claim.

Specifically, the Government posits that *Washington Federal* squarely forecloses Appellants' taking claim. Resp. Br. 26-30. But its position relies upon two false premises: (1) *Washington Federal* categorically foreclosed any and all taking claims resulting from GSE conservatorship; and (2) Appellants' claims are "substantively identical" to the claim dismissed by this Court in *Washington Federal* and thus precluded. *See id.* Neither is accurate.

1. Appellants' Allegations Related to Tier 1 Capital Regulatory Scheme Pre-Dating HERA Must be Credited

In its response, the Government—desperate to confine Appellants to the allegations of the class representatives in *Washington Federal*—disingenuously equates Appellants' reliance on class action tolling (assuming this Court reaffirms the rule's application) as limiting Appellants' allegations to that of the former class representatives whose claims this Court's dismissed. *See* Resp. Br. 29.

However, the Government's argument of "claim equivalence" is duplicitous, lacks any supporting authority, and belies the numerous, additional, distinguishing allegations—bolstered by the admissions of multiple government officials directly involved—that set Appellants' claim apart. Failing to credit these allegations violates the legal mandate which "accept[s] as true all undisputed facts asserted in the plaintiff's complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

The additional allegations include, but are not limited to, the following:

- The Government induced and encouraged the FBOP Subsidiaries to purchase the GSE preferred shares by assigning a 20% capital risk weighting to the GSE preferred shares (which was the same risk weighting as cash) and permitting banks to invest up to 100% of their Tier 1 Capital in the preferred shares. As intended by the Government, the FBOP Subsidiaries recapitalized the GSEs by purchasing the GSE preferred shares as their Tier 1 Capital. Appx126, ¶139;

- The Government's regulatory treatment of a bank's investment in Tier 1 Capital broadcast to the FBOP Subsidiaries that investing their Tier 1 Capital in the GSEs would not risk bank failure and that investing

even up to 100% of the Tier 1 Capital in GSE preferred shares left the banks in a secured capitalized position and operationally secure. But for these regulatory incentives and promises, the FBOP Subsidiaries would not have invested their Tier 1 Capital in GSE preferred shares. Appx126, ¶141;

- FBOP and the FBOP Subsidiaries had reasonable investment-backed expectations that the investments in the GSEs were stable and not subject to a risk of immediate substantial losses capable of leaving the FBOP Subsidiaries undercapitalized and that the United States would not take actions that would destroy the value of the shares that it had previously encouraged the FBOP Subsidiaries to use as Tier 1 Capital. Appx127, ¶142;

- The Government, knowing that it had encouraged banks to invest up to 100% of their Tier 1 Capital in the GSEs, knew that the imposition of the conservatorship would be a devastating taking of the banks' Tier 1 Capital and would render banks like the FBOP Subsidiaries insolvent. The Government knew that the result of the conservatorship would (and in fact did) (1) result in the loss of the banks' Tier 1 Capital; (2) would cause the banks to immediately default on their Tier 1 Capital requirements ; (3) would cause the banks to become insolvent ; and (4) would result in Government seizure of the banks. Appx129, ¶149;

- As a direct result of HERA, the conservatorship, and the SPSPAs, the United States destroyed the reasonable investment-backed expectations of the FBOP Subsidiaries and put the FBOP Subsidiaries into receivership. This took place despite the Government's prior commitments regarding the safety of the investment and its specific efforts to encourage banks like FBOP Subsidiaries to put their Tier 1 Capital in the GSEs. Appx130, ¶152.

Yet, despite this litany of detailed factual allegations, the trial court ignored them and, as a result, erroneously oversimplified the lynchpin of Appellants' claims—the taking of Tier 1 Capital and all other bank assets. Resorting to an overly broad application of *Washington Federal*, the trial court failed to fully

analyze the complaint's allegations, and short-circuited Appellants' legally sufficient claim.

No such shortcut can be taken here. But that is precisely what the trial court below did. Merely because the different claims pled by the class representatives in *Washington Federal*, and Appellants here, were initiated by and arose from the same government act—the nationalization of the GSEs—does not mean, *ipso facto*, that the decision of *Washington Federal* controls. As clearly pled, neither the distinct nature and character of the property taken from Appellants, nor their discrete, individualized, reasonable investment-backed expectations were addressed by *Washington Federal*.

The consistent precedent of this Court—which must be applied to every constitutional taking claim—repeatedly cited by Appellants, was left ignored and unaddressed by the trial court below and again by the Government in this appeal.

2. <u>*Washington Federal* Does Not Control Where Appellants' Property Interests and Their Investment-Backed Expectations are Distinguishable</u>

The Government's position hinges on the premise that *Washington Federal* forecloses any claim related to the GSE conservatorship. Not so.

This Court's *Washington Federal* holding is specific and limited. The panel there determined that shareholders who pleaded <u>nothing more</u> than a dilution of share value lacked a cognizable property interest and a concomitant investment-

backed expectation and, on those facts, failed to state a regulatory takings claim. *See* Resp. Br. 26-27; *Washington Federal*, 26 F.4th at 1266. The Government's myopic notion that *Washington Federal* is so comprehensive that it subsumes Appellants' distinct taking claims, based simply on the single, common, factual thread of the GSE conservatorship, belies basic principles of stare decisis and binding precedent. *See, e.g.*, *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993).

To the contrary, the subject property of Appellants' takings claims <u>is not</u> the value in the stock, but rather, as pled, the fact that their Total Bank Assets were taken—the vast majority of which were completely unrelated to the GSE stock. *See* Appx117-125.

Neither the banks nor the government had the "reasonable investment-backed expectation" that such a massive, comprehensive confiscation would ever occur. Had they anticipated it, neither would have fashioned Tier 1 Capital to include GSE stock as a component, particularly where the government approved and promoted the conversion of "up to 100%" of the banks' Tier 1 capital to GSE Stock. Such a position would be irrational on the part of both parties—both being fully aware of the inevitable result of a loss in value of Tier 1 Capital. That is: a complete seizure by the Government of all of Appellants' bank assets by mandated regulatory insolvency.

Furthermore, the Government's response operates from a fundamental misunderstanding (or, at the very least, an intentional omission) of the factually intensive nature of a regulatory taking claim. The Government utterly fails to address the numerous authorities discussing how Appellants' investment-backed expectations are facially distinct from the one identified by the Court in *Washington Federal*. *See* Op. Br. 49-57; *Washington Federal*, 26 F.4th at 1266.

Nowhere is this more glaring than the Government's wholesale failure to acknowledge—let alone analyze—that <u>a distinct property interest begets a distinct investment-backed expectation</u>. *See* Op. Br. 48-49. As such, its conclusion that Appellants' claims are "substantively identical" to those alleged in *Washington Federal* is simply not true.[1] *See* Resp. Br. 26, 32. To put it bluntly, a government taking of one's total assets by a "bait and later switch" cannot eviscerate—but rather requires—constitutionally-mandated, just compensation.

As this Court has long recognized, every takings analysis is "characterized by an 'essentially ad hoc, factual inquir[y]"…designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002) (quoting

---

[1] As is any notion that Appellants lack standing or have privity with the *Washington Federal* class representatives for purposes of formal claim preclusion. *See* Op. Br. 47-57. The additional property rights at stake—Tier 1 Capital and the Total Bank Assets—utterly destroy those conclusions. Nothing in the Government's response overcomes this.

*Penn Cent.*, 438 U.S. at 124 and *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).

This is because "[t]he focus of the regulatory takings analysis is on fundamental fairness—is it fair for the government to impose the cost of a regulation on private parties rather than on the public as a whole through public spending? To make this determination, there is no set formula…[T]here simply is no bright line dividing compensable from non-compensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner. What is necessary is a classic exercise of judicial balancing of competing values." *Cienega Gardens v. U.S.*, 503 F.3d 1266, 1278 (Fed. Cir. 2007) (cleaned up) ("*Cienega X*").

Therefore, whether a regulatory taking has "gone too far" depends upon "a complex of factors," including the regulation's economic effect, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *See, e.g., Palazzolo*, 533 U.S. at 617. And whether a regulation interferes with investment-backed expectations is itself subject to a "multi-step analysis." *Cienega X*, 503 F.3d at 1289.

Despite Appellants' extensive discussion of these factors, the Government completely ignored them in its response. But this Court cannot.

As Appellants point out, this Court's clear precedent discussing those

factually-intensive factors emerged in a series of cases involving the "Preservation Statutes[2]." *See* Op. Br. 50-54.

Those cases involve a strikingly similar regulatory claim to the one alleged here by Appellants. In them, owners of low-income housing projects brought actions against the United States Department of Housing and Urban Development (HUD), alleging that, <u>at the time of the owners' initial investment</u>, the applicable regulations allowed for the right to prepay government-insured mortgages and that <u>subsequent enactment</u> of the ELIHPA and LIHPRHA statutes, which prevented owners from exercising their right to prepay those mortgages, constituted regulatory takings under the Fifth Amendment. *See, e.g., Cienega X*, 503 F.3d at 1270-74.

As a result of those cases, this Court has conclusively established, *inter alia,* how investment-backed expectations are assessed[3]:

- Investment-backed expectations are examined <u>at the time of investment</u>, not at the time of enactment of a later regulation or thereafter (*Cienega X*, 503 F.3d at 1288 ("[t]he burden is on the owners to establish a reasonable investment-backed expectation in the property at the time [they] made the investment."));

[2] The "Preservation Statutes," as they are colloquially referred to by this Court, are formally known as the Low-Income Housing Preservation and Resident Homeownership Act ("LIHPRHA") and the Emergency Low-Income Housing Preservation Act of 1987 ("ELIHPA").

[3] *See Gardens v. United States*, 174 Fed.Cl. 700 (2025) (summarizing Preservation Statute precedent: "courts must conduct an intensive factual inquiry with little predictability regarding outcomes…the Court is aided in this wide-ranging inquiry by guidance provided in the most recent Federal Circuit precedent…").

- Whether the investment at issue was made prior to enactment of regulation that led to the taking (*Cienega Gardens v. U.S.*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) (Michel, J.) ("if plaintiffs owned such a vested property interest, did the regulatory restrictions in the new statutes go 'too far' in constraining them, thereby entitling the plaintiffs to compensation?")(emphasis added) ("*Cienega VIII*"); *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1350-51 (Fed. Cir. 2020) (remanding pre-enactment claim because fact issues barred summary judgment);

- An examination of the expectations of the industry as a whole (*CCA Associates*, 667 F.3d at 1247 (citing *Cienega X*, 503 F.3d at 1290) ("By comparing the individual's expectations with the 'expectations of the industry as a whole,' we aim[ ] to separate unreasonable, though subjectively believed, investment[-]backed expectations from objectively reasonable expectations"));

- There can potentially be multiple objectively reasonable investment strategies dictated by geography, economics, or other factors (*CCA Associates*, 667 F.3d at 1247);

- With the recognition that a taking in a highly regulated industry does not negate a constitutional right to just compensation (*Cienega VIII*, 331 F.3d at 1333 ("Nor is the regulated nature of federal housing programs a talisman that automatically prevents vesting of the right to prepay.");

- That the ability to exercise every one of the "sticks" in the "bundle" of rights is not a prerequisite to establishing a valid property interest; every sort of property interest qualifies under the Fifth Amendment (*Cienega VIII*, 331 F.3d at1319); and

- Most critically, inherent factual disputes underlying these factors prevent even summary judgment, let alone summary dismissal at the case's outset (*see, e.g.*, *Cienega VIII*, 331 F.3d at 1353-54 (remanding to develop factual record); *Anaheim Gardens*, 953 F.3d at 1357 (fact issues regarding expert testimony precluded summary judgment); *Cienega X*, 503 F.3d at 1291 (remanding to allow parties to provide additional evidence related to "actual investment and the expectations

of the industry”)).

Having unwound the Government’s ill-fated attempt to bootstrap *Washington Federal* onto Appellants, there is only one path forward: This case is governed by this settled precedent, which necessarily requires reversal.

3. Properly Applying Federal Circuit Precedent Makes Clear That The Motion to Dismiss was Improperly Granted

Appellants allege—at length, and in great detail, with direct quotations of the highest government officials involved—the regulatory environment that existed at the time they converted their Tier 1 capital assets to the government-approved and promoted GSE investments. Appx91-100.

As this Court has previously opined, far from a biased, “subjective” perception, this regulatory environment was objectively and openly embraced by both the industry and the government at the time. It is undisputed that, prior to any inkling that HERA would even come into existence, the industry and the Government operated on the “perception that the federal government would honor the obligations of the GSEs should they experience financial difficulties.” *See Washington Federal*, 26 F.4th at 1260 (citing *Perry Cap. LLC v. Lew* (“*Perry I*”), 70 F. Supp. 3d 208, 215 (D.D.C. 2014); Dep't of Treasury & Dep't of Hous. & Urb. Dev., Reforming America's Housing Finance Market: A Report to Congress 8 (2011) (“Treasury & HUD Report”) (“[The Enterprises] benefited from ... a widely perceived government guarantee—the commonly held assumption [the expectation

of the industry as a whole] that large losses would be backstopped by the taxpayer."); *see Cienega X*, 503 F.3d at 1290.

HERA did not exist and was not even expected at the time Appellant banks invested their Tier 1 Capital assets at the Government's urging. *See* Appx92-100 (investment was made in late 2007-early 2008); *cf. Washington Federal*, 26 F.4th at 1266 (noting that investment-backed expectation changed once the conservatorship was imposed). Moreover, Appellants' very participation in the refined Tier 1 Capital investment arrangement offered by the Government confirmed their understanding that the Government would not take any actions to damage the value of the GSE investments. *See Cienega VIII* 331 F.3d at 1347 ("The Model Plaintiffs' very participation in the program thus signifies their understanding that their option to exit the housing programs at twenty years would remain in effect. The trial court makes it clear that they would not have participated in the programs otherwise the Owners being indefinitely constrained…The later legislation thus conflicted with the Model Plaintiffs' investment-backed expectations.")

Both the government and the trial court "assumed" (which they are not entitled to do) that Appellants as banks could not have had a reasonable investment-backed expectation that all of their vested property assets, GSE stock and all other unrelated assets, would not be taken by the Government. Such an

erroneous assumption is completely unfounded and cannot be sustained. The clear allegations of the complaint contradict this groundless assumption and, at the very least, establish a factual dispute on this critical factual issue not capable of summary disposition. Properly applying this Court's precedent makes clear that Appellants have indisputably stated a claim sufficient to overcome the Government's motion to dismiss. A factual record must be developed before any determination can be made as to whether they can satisfy the *Penn Central* factors[4]. *See generally Cienega X,* 503 F.3d at 1266.

The Government also continues to urge that the breadth of the conservator's powers, established for the first time under HERA, is enough to vitiate Appellants' Fifth Amendment rights. *See* Resp. Br. 27. It has long been axiomatic, of course, that an economic regulation cannot be used to bar or extinguish a person's constitutional right to just compensation upon a government taking. *See Calder v. Bull*, 3 Dall. 386, 388 (1798) (opinion of Chase, J.) ("It is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes *property* from A. and gives it to B.") (emphasis in original).

More importantly, the conservator's powers under HERA are irrelevant with respect to Appellants because all of them were pre-HERA purchasers, and

[4] Such a factual record is necessary regardless, given that Appellants have stated a valid *per se* taking as well. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992).

investment-backed expectations must be examined as of the time of the acquisition, not at or after the enactment of the subsequent HERA regulation. *Cienega X*, 503 F.3d at 1288.

Because Appellants' taking claim is not "identical" to the one brought by the former class representatives, *Washington Federal* does not foreclose Appellants' claims as a matter of law. *See* Resp. Br. 26, 32. Moreover, even though the Government prefers to ignore it, this Court's line of precedent arising out of the Preservation Statutes squarely controls. Appellants' claims could not and should not have been summarily decided on a motion to dismiss.

### C. Appellants Have Stated A Valid Claim for Breach of Implied Contract

Though the Government relies heavily upon the "high bar" Appellants must clear to "show" an implied contract with the Government (Resp. Br. 38), its position again tries to ignore and evade the factual disputes that inherently lie beneath. Simply put, there is a big difference between stating a claim sufficient to survive a motion under Rule 12(b)(6) and ultimately proving the implied contract claim. Even the cases relied upon by the Government demonstrate this. *See, e.g.*, *Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1378 (Fed. Cir. 2008) (reviewing entry of summary judgment); *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003) (same).

This Court has recognized that "a formal written agreement is not necessary

to prove the existence of a *Winstar* contract when there is other adequate evidence of the government's intent to form a contract." *Mola*, 516 F.3d at 1378. This "other evidence" can include "not only the contemporaneous documents but also the circumstances surrounding the transactions." *Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1229 (Fed. Cir. 2005) (citing *Winstar Corp. v. United States*, 64 F.3d 1531, 1540-44 (Fed. Cir. 1995), *aff'd.*, 518 U.S. 839 (1996) ("…this court determined that the Government was contractually obligated to recognize supervisory goodwill resulting from the transactions as a capital asset and to permit such goodwill to be amortized over an extended period of time.")[5])

Further, testimony that contract terms were orally negotiated may not be disregarded, and contractual terms can be found in regulatory documentation. *Fifth Third*, 402 F.3d at 1234 ("Since standardized agency documents are the way in which regulatory agencies typically memorialize their actions, the FHLBB can memorialize a contractual commitment in agency documents.")

Appellants have sufficiently pled their *Winstar* claim (Appx147-149) and are entitled to discovery, including contemporaneous documentation, the testimony of percipient witnesses to the transactions[6], and other evidence of the government's

[5] *See Cienega VIII*, 331 F.3d at 1334 ("[*Winstar*] showed that the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking, because the contracts embodied the commitments of the contracting parties…")

[6] The same witnesses will already be testifying to the factual circumstances

intent to contract.

## III. CONCLUSION

For all the reasons discussed herein, Appellants respectfully request that this Court vacate the CFC's dismissal and remand for further proceedings.

Respectfully submitted,

DIAMOND MCARTHY LLP

/s/ Allan Diamond
Allan Diamond
909 Fannin Street, Suite 3700
Houston, Texas 77010
Tel.: (713) 333-5100
Email:
allan.diamond@diamondmccarthy.com

LARSON LLP

/s/ Robert F. Ruyak
Robert F. Ruyak
900 17th Street, N.W., Suite 320
Washington, DC 20006
Tel.: (202) 795-4900
Email: *rruyak@larsonllp.com*

*Counsel for Plaintiff-Appellant*

March 14, 2025

underlying Appellants' investment-backed expectations as part of their regulatory taking claim. This, of course, is also why the Government's assertion—that Appellants' implied contract claim is so different that it would not benefit from class action tolling—is wholly disingenuous. *See* Resp. Br. 36; *see also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 355 (1983) (tolling should apply when claims involve same evidence, memories, and witnesses).

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2042

**Short Case Caption:** Kelly v. U.S.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,859 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 03/14/2025

Signature: /s/ Robert F. Ruyak

Name: Robert F. Ruyak